500 S.E.2d 168

**Misty Dawn HAGY, f/k/a Misty Dawn Pruitt, and Guy Stanley Hagy, Respondents,**

**v.**

**Donald Jerome PRUITT, Ann Lyle Pruitt and Elizabeth Dawn Pruitt, Defendants,**

**of whom Donald Jerome Pruitt and Ann Lyle Pruitt are, Appellants.**

**In re Elizabeth Dawn PRUITT, a minor under the age of four (4) years.**

**No. 2837.**

Court of Appeals of South Carolina.

Heard Dec. 2, 1997.

Decided May 4, 1998.

Rehearing Denied June 19, 1998.

John P. Bacot, Jr., Surfside Beach, for appellants.

Charles E. Parrish, of S.C. Dept. of Social Services, Conway; Ian D. Maguire, of Suggs & Kelly, Columbia, for respondents.

Guy Stanley Hagy, California, pro se.

O. Terry Beverly, Conway, Guardian Ad Litem.

HUFF, Judge:

This action was brought by respondent, Misty Dawn Hagy, to set aside the adoption of her infant daughter, Elizabeth Dawn Pruitt, by Misty's father and stepmother, Donald and Ann Pruitt. The family court judge set aside the adoption and Donald and Ann appeal. We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

In 1990, fifteen year old Misty Dawn Pruitt became pregnant while living with her mother, Linda Sue Pauley, in Virginia. She told her father, Don Pruitt, about her situation, and he invited her to live with him and his wife, Ann, in Myrtle Beach. Misty moved to his house with the understanding that her boyfriend, Guy Stanley Hagy (Stan), who was seventeen at the time, could also come and live with them. She wanted to get married and testified her father agreed to give his consent to their marriage before she moved. Misty moved in January 1991 without telling her mother. Stan followed in April 1991. Misty and Stan lived with Don and Ann off and on after their move to Myrtle Beach.

On August 25, 1991, two days after Misty turned sixteen, Elizabeth Dawn Hagy was born. According to Misty, her father first brought up the idea that he and Ann should adopt Elizabeth when she was two months old. Don, however, said he and Misty discussed the adoption before Stan moved down. An appointment was arranged with Mark Chandler, an attorney hired by Don and Ann, to draw up the petition for adoption and consent papers. Stan and Misty signed the papers at the first meeting with Chandler. After they left, Chandler realized the papers had not been signed in the "proper" way and he set them aside.

After the consents were set aside, copies of them were sent to another attorney, Anne James. On December 6, 1991, Stan and Misty met with James, reviewed the consent forms, discussed the consequences of signing them, and signed them again. On December 12, 1991, the day after the consents were filed, Don signed the consent form necessary for Stan and Misty to get married, which they did on October 3, 1992.[1]

---

1. Stan and Misty separated in November 1993. They are now divorced and Misty lives in Virginia.

On June 5, 1992, the adoption hearing was held. Neither Stan nor Misty attended because Don told them it was "in the best interest if they not go." On June 18, 1992, the family court issued a final order of adoption. In August 1994, Misty took Elizabeth from the Pruitts and fled. A warrant was issued for her arrest on federal kidnaping charges shortly thereafter. In December 1994, she returned to South Carolina to face the charges and filed this action to vacate the adoption, or in the alternative, terminate the parental rights of Don and Ann, and restore her full parental rights. Stan joined the action.

On November 1, 1995, following a hearing on the matter, the family court judge issued his order setting aside the adoption. The judge found:

1. A collateral attack was not barred under S.C.Code Ann. § 20–7–1800 because case law allows an adoption to be attacked on the basis of fraud;

2. The action was not barred by collateral estoppel or res judicata;

3. Statutory language required the appointment of a guardian ad litem for Misty, a minor parent, in the adoption proceedings;

4. The consent was obtained by Don and Ann's "misrepresentation of material facts" regarding the adoption's permanent effect on Misty's parental rights and relationship with Elizabeth;

5. Misty's consent was procured by fraud and rendered without the benefit of a guardian ad litem or independent counsel and the adoption must therefore be vacated and Misty's parental rights restored.[2]

Pending a final custody hearing, Elizabeth was placed in the custody of the Horry County Department of Social Services, with physical custody to be shared between Misty and Don and Ann. Misty's mother, Linda Sue Pauley, consented to the

---

2. In her brief, Misty states that "the trial judge's decision that a guardian ad litem should have been present to represent Misty in the adoption proceeding is not aligned with South Carolina precedent." Because Misty concedes this issue, we do not address the correctness of this ruling.

court's jurisdiction and was ordered to supervise all of Elizabeth's visitation with Misty.   Don and Ann Pruitt appeal.

## LAW/ANALYSIS

■   The Pruitts contend the family court judge erred in allowing a collateral attack on the adoption decree.   They assert such an attack is precluded by S.C.Code Ann. § 20–7–1800 (Supp.1996) because it was brought more than one year after the issuance of the final adoption decree.   We agree.

In ruling the action to set aside the adoption was not barred by § 20–7–1800, the family court judge relied on the cases of *Wold v. Funderburg,* 250 S.C. 205, 157 S.E.2d 180 (1967) and *Lowe v. Clayton,* 264 S.C. 75, 212 S.E.2d 582 (1975).   In *Wold,* a mother moved to set aside an adoption decree, arguing she did not consent and if she did, the consent was based on fraud. She further asserted the signature of the natural father was forged.   The adopting parents asserted the suit was barred based on a prior Georgia order.   Our supreme court ruled the collateral attack was allowed because it was based on fraud. The court noted that normally, a judgment regular on its face may not be collaterally attacked, but this rule does not apply where extrinsic fraud has been practiced to procure the judgment.   Accordingly, a judgment may be attacked collaterally where fraud has been practiced in the very act of obtaining the judgment, or on the party against whom the judgment was rendered, so as to prevent him from having a fair opportunity to present his case.   In *Lowe,* the natural mother moved to have an adoption set aside on the grounds that consent was obtained through "fraud, deceit, and misrepresentations . . . that the adoption was one of convenience, was temporary, and that she would always be allowed to see and visit her daughter as her mother."   The lower court granted summary judgment to the adoptive parents based on a prior order denying visitation rights to the natural mother.   The supreme court reversed the order granting summary judgment, finding the decree could be collaterally attacked and should be set aside if the mother's consent was obtained through fraud and misrepresentation.

The question before us is not whether the adoption decree may be collaterally attacked where fraud is alleged in the

procurement of parental consent. Rather, the question is whether the action is barred by § 20–7–1800 because it was brought more than one year after the issuance of the final adoption decree. Section 20–7–1800 provides:

> An appeal is allowed from any final order, judgment, or decree rendered under this Subarticle 7 of Article 11 of Chapter 7 of Title 20 by any person against whom the order, judgment, or decree may be made or who may be affected by the order, judgment, or decree in the manner provided for appeals from the court in other family court matters. No final decree of adoption is subject to collateral attack **for any reason** after a period of one year following its issuance.

(Emphasis added).

We note that neither *Wold* nor *Lowe* directly addressed the issue of whether a statutorily mandated time limit on collateral attacks was applicable to an attack on an adoption decree where parental consent was allegedly obtained by fraud. These two cases held that the actions to set aside the adoptions were not barred on the basis of collateral estoppel or *res judicata* where fraud in the procurement was alleged.[3] More importantly, these cases occurred prior to the enactment of the pertinent Adoption Act.

S.C.Code Ann. § 20–7–1650 *et seq.* (Supp.1996), our current Adoption Act, was enacted in 1981 by Act No. 71, § 1. S.C.Code Ann. § 20–7–1720 (Supp.1996) allows for withdrawal of one's consent to adoption by order of the court but further provides that "entry of the final decree of adoption renders any consent or relinquishment irrevocable." Thus, consent may be withdrawn but only prior to issuance of the final decree of adoption. S.C.Code Ann. § 20–7–1800 allows for appeal of a final order but prohibits any collateral attack on the final decree of adoption for any reason after a period of one year following issuance of that decree. This statute was enacted subsequent to the decisions handed down in *Wold* and *Lowe*. The legislature made no special exception for cases

---

**3.** *But see South Carolina Dept. Of Social Services v. Durham,* 274 S.C. 222, 262 S.E.2d 49 (1980) (citing *Wold* for proposition that one year statutory time limit has been held inapplicable in cases where judgment was procured by fraud). Like *Wold* and *Lowe,* this case was prior to the enactment of § 20–7–1800.

involving fraud. Our primary function in interpreting a statute is to ascertain the legislative intent. *Spartanburg County D.S.S. v. Little*, 309 S.C. 122, 420 S.E.2d 499 (1992). A statute must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. *Id.* We find that by enacting § 20–7–1800, the legislature contemplated establishing a statutory time limit for collaterally attacking an adoption decree for any basis, including that of fraud. Accordingly, Misty may very well have collaterally attacked the prior adoption decree on the basis of fraud pursuant to *Wold* and *Lowe.* However, she was required to bring any such action within a year of the issuance of the final decree of adoption pursuant to § 20–7–1800. She failed to do so. Accordingly, the family court judge erred in setting aside the adoption.

Because we reverse the family court judge on this basis, we need not address the other issues raised by the Pruitts on appeal. The order below is

**REVERSED.**

ANDERSON, J., concurs, and HOWARD J., concurs in a separate opinion.

HOWARD, Judge, concurring:

I concur only in the result reached by the majority. However, I disagree with the majority's basis for reversal. The majority states the issue as follows:

> "The question before us is not whether the adoption decree may be collaterally attacked where fraud is alleged in the procurement of parental consent. Rather, the question is whether the action is barred by § 20–7–1800 because it was brought more than one year after the issuance of the final adoption decree."

The majority then concludes that the specific language in section 20–7–1800 precludes this action. In so doing, the majority overlooks the fact that the basis for the action and for the relief given in the lower court is fraud. Thus, the majority has concluded that section 20–7–1800, which precludes collateral attack for any reason after one year from the issuance of the decree, bars a collateral attack based on any

type of fraud, even one perpetrated upon the court. I do not agree with this overly general statement for the reasons set forth in the following paragraphs.[1] However, because I do not believe the natural mother proved fraud upon the court, I agree with the result reached by the majority.

## I. STATUTE OF LIMITATIONS

Section 20–7–1800, contains the following pertinent language:

> No final decree of adoption is subject to collateral attack for any reason after a period of one year following its issuance.

Our supreme court recognized the inherent power of the court to grant relief from a judgment on the grounds of extrinsic fraud in *Bryan v. Bryan,* 220 S.C. 164, 66 S.E.2d 609 (1951). The court relied upon *United States v. Throckmorton,* 98 U.S. 61, 25 L.Ed. 93 (1878) and adopted a distinction between extrinsic fraud and intrinsic fraud which has survived in South Carolina despite its demise in the federal rules. *See* FED.R.CIV.P. 60(b); *but cf. Evans v. Gunter,* 294 S.C. 525, 366 S.E.2d 44 (Ct.App.1988); *Bankers Trust Co. v. Braten,* 317 S.C. 547, 455 S.E.2d 199 (Ct.App.1995); *Mr. G. v. Mrs. G.,* 320 S.C. 305, 465 S.E.2d 101 (Ct.App.1995) (Hearn, J., dissenting).

"Extrinsic fraud is fraud that induces a person not to present a case or deprives a person of the opportunity to be heard." *Hilton Head Center v. Public Service Comm'n,* 294 S.C. 9, 11, 362 S.E.2d 176, 177 (1987). "Relief is granted for extrinsic fraud on the theory that because the fraud prevented a party from fully exhibiting and trying his case, there has never been a real contest before the court on the subject matter of the action." *Id.* at 11, 362 S.E.2d at 177 (citing *Corley v. Centennial Const. Co.,* 247 S.C. 179, 146 S.E.2d 609

---

1. Only one example is necessary to demonstrate the harshness of the interpretation announced by the majority. Under the majority's view, the adoption of a kidnaped child employing forged documents could not be set aside unless the child were found and an action instituted within one year from the date a decree was issued. Such deceit is not, unfortunately, beyond reality. *See Wold v. Funderburg,* 250 S.C. 205, 157 S.E.2d 180 (1967)(use of forged signature on consent); *In the Matter of T. Aladdin Mozingo,* 330 S.C. 67, 497 S.E.2d 729 (1998) (attorney's forgery of Supreme Court Justice's signature on court order). I do not think the legislature could have intended such a result.

(1966)). Intrinsic fraud "is fraud that misleads a court in determining issues and induces the court to find for the party perpetrating the fraud." *Hilton Head Center v. Public Service Comm'n,* 294 S.C. 9, 11, 362 S.E.2d 176, 177 (1987). By limiting the fraud for which collateral relief may be granted to that which is extrinsic, and thereby not discoverable through the process of trial, the balance is drawn between finality of judgments, on the one hand, and preserving the court's fundamental purpose of providing a fair and just resolution of disputes, on the other. *See Mr. G. v. Mrs. G.,* 320 S.C. 305, 465 S.E.2d 101 (Ct.App.1995) (Hearn, J., dissenting).

More recently, the distinction between extrinsic fraud and intrinsic fraud has been criticized, in part because of the difficulty in distinguishing the two. *Id.* Irrespective of the viability of this distinction, however, there can be no doubt that some acts of fraud render a decision fundamentally flawed. As Justice Black stated in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944):

> From the beginning there has existed ... a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry. This equity rule, which was firmly established in English practice long before the foundation of our Republic, the courts have developed and fashioned to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule. Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. But where the occasion has demanded, where enforcement of the judgment is "manifestly unconscionable", they have wielded the power without hesitation.

*Id.* at 244–45, 64 S.Ct. at 1000–1001 (citations omitted).

A basic rule of statutory interpretation requires a construction which is constitutional. Constitutional constructions of statutes are not only judicially preferred, they are mandated; a possible constitutional construction must prevail over an

unconstitutional interpretation. *Henderson v. Evans,* 268 S.C. 127, 232 S.E.2d 331 (1977).

Our supreme court concluded in *Williams v. Bordon's Inc.,* 274 S.C. 275, 262 S.E.2d 881 (1980), that a statute which attempts to exercise ultimate authority over the inherent power of the court is unconstitutional because it violates the separation of powers doctrine which is set forth in South Carolina Constitution Article 5, Section 1. The court stated that a legislative attempt to determine when and under what circumstances lawyer-legislators may be exempt from court appearances is violative of the provision requiring separation of powers because the adjudicative power of the court carries with it the inherent power to control the order of its business to safeguard the rights of litigants. *See also Center v. Center,* 269 S.C. 367, 237 S.E.2d 491 (1977) (one year time limit imposed by Section 15–27–130 applies only to those causes listed in the statute and has no effect on the equity power of a court to set aside a judgment procured by fraud) (citing *Ex Parte Carroll,* 17 S.C. 446 (1882); *Ex Parte Gray,* 48 S.C. 566, 26 S.E. 786 (1897)). An interpretation of section 20–7–1800 which prevents a collateral attack on grounds of extrinsic fraud after one year from the date of issuance of the decree suffers from the same fatal defect.

The clear wording of section 20–7–1800 prevents collateral attack after one year from the date of issuance of the decree of adoption. Extrinsic fraud may prevent discovery of the proceeding or final decree more than one year after entry. To construe this provision to apply to a collateral attack based on extrinsic fraud would violate Article 5, Section 1, of the South Carolina Constitution by impermissibly reposing in the legislature ultimate authority over this inherent power of the court. *Williams v. Bordon's Inc.,* 274 S.C. 275, 262 S.E.2d 881 (1980). For this reason, I do not construe section 20–7–1800 to apply to a collateral attack on a decree of adoption based on extrinsic fraud. *See Center v. Center,* 269 S.C. 367, 237 S.E.2d 491 (1977); *cf. Strong v. University of South Carolina School of Medicine,* 316 S.C. 189, 447 S.E.2d 850 (1994); *Berry v. McLeod,* 328 S.C. 435, 492 S.E.2d 794 (Ct.App.1997); *Burgess v. American Cancer Soc.,* 300 S.C. 182, 386 S.E.2d 798 (Ct. App.1989) (statute of limitations for causes of action for fraud is governed by discovery rule and does not begin to run until

discovery of the fraud itself or of such facts as would have led to the knowledge thereof, if pursued with reasonable diligence).

Because I would find that the action is not barred by section 20–7–1800, it is necessary to address the remaining arguments. The Pruitts argue that if the action is not automatically barred by section 20–7–1800, the trial court should have granted their motion to dismiss because the action was brought more than one year after Misty turned eighteen, and was thus barred. To the extent the action is based on allegations of extrinsic fraud, however, this argument is without merit for the reasons set forth above.

## II. FRAUD

The remaining arguments of the Pruitts contest the factual conclusions of the trial court. Because this proceeding is in equity, our scope of review extends to the finding of facts based on our own view of the preponderance of the evidence. *Doe v. Clark*, 318 S.C. 274, 457 S.E.2d 336 (1995). I, therefore, review these findings of fact to determine whether the evidence supports a finding of extrinsic fraud.

The family court found as support for its ruling that Misty and Stan were not given notice of the adoption hearing. The court found that the consent obtained from Misty by the Pruitts resulted from a misrepresentation of material fact as to the permanency of the termination of her parental rights. The court also concluded that because of her age, her naivete, and her vulnerability, Misty was manipulated and coerced into allowing the adoption. The court likened her condition to that of an incompetent. Relying on Rule 17(c), SCRCP, and S.C.Code Ann. § 20–7–1695 (Supp.1997) (applicable to incompetents), the court concluded a guardian should have been appointed for her in the adoption proceeding. I disagree with these findings and conclusions.

## A. NOTICE

There is no doubt a fraudulent scheme which circumvents a party's right to notice in a proceeding "induces a person not to present a case or deprives a person of the opportunity to be heard." *Hilton Head Center v. Public Service Comm'n*, 294

S.C. 9, 11, 362 S.E.2d 176, 177 (1987). As such, it could provide a basis for finding extrinsic fraud, if established by the evidence. *See Center v. Center,* 269 S.C. 367, 371–72, 237 S.E.2d 491, 493–94 (1977). But this record does not support that conclusion.

Both Misty and Stan waived any further notice in the proceeding by the execution of their consents, which contained the waiver. This waiver is expressly mandated by section 20–7–1700, which states "[c]onsent or relinquishment for the purpose of adoption ... shall specify the following: ... (9) that the person or agency giving the consent or relinquishment waives further notice of the adoption proceedings, unless the proceedings are contested by another person or agency...." § 20–7–1700. Section 20–7–1734(A) states that notice of the proceeding must be given to a parent *"unless* the person has given consent or relinquishment or parental rights have been terminated." S.C.Code Ann. § 20–7–1734(A) (Supp.1996) (emphasis added). Therefore, no notice to Misty or Stan was required, since the adoption proceeding was not contested by any person or agency.

Even if the consent had not contained a specific waiver of further notice, both Misty and Stan testified that they knew the date and time of the adoption hearing. They simply chose not to go because the Pruitts told them "it would not be in the best interest."

## B. MISREPRESENTATION

Next, the trial court found that the Pruitts procured the consent of Misty and Stan through misrepresentations as to the finality of the adoption. Of course, Don Pruitt denies misleading Misty or Stan, though he does acknowledge he contemplated they would continue to reside in his home, and that they would continue to play a role in Elizabeth's life as siblings.

Misty and Stan met with two different attorneys to review the consents. The consent forms clearly stated that the consent was irrevocable, and that the entry of the final decree rendered the consents irrevocable. James testified she went over these provisions with Stan and Misty, stating:

I sat in the conference room with [Stan and Misty] and my secretary and went over the consent forms in detail, line by line. I explained to them that this was a final transaction ... [I] explained to them that this terminated the relationship, parent and child, that if the adoption took place and by signing the consents, they were giving up their rights to this child forever, they would—and if the adoption was approved by the court it would be a forever bar essentially from them having any rights to the child.

Stan acknowledged in his testimony that James explained the finality of the proceedings. Misty stated that the Pruitts' attorney discussed with her the finality of the adoption, although she denied any recollection of a discussion with James. Both parties testified that, having full knowledge of the finality of the consents, they agreed to the adoption because they felt it was in Elizabeth's best interests.

The family court concluded Misty had been misled because the Pruitts' represented that the adoption was a temporary change to obtain financial assistance for Elizabeth as Don Pruitt's dependent.[2] By representing to Misty that they considered it a temporary change which could later be undone, the court concluded the Pruitts lulled Misty into a false sense of security, leading her to consent and forego her right to contest the proceeding. The court focused on the tender age of Misty and the father-daughter relationship as a prime factor leading to this conclusion.

Even if these allegations are viewed as alleging extrinsic fraud, the evidence does not support the conclusion that Misty and Stan were deprived of the opportunity to be heard.

Under any view of the evidence, they were given ample notice from disinterested parties, which they acknowledge receiving, that the termination of their parental rights would be final. Both Misty and Stan were financially unable to care for Elizabeth. They also acknowledge the Pruitts presented

---

2. Don Pruitt is a disabled veteran who received financial assistance based on Misty's dependence. When she married Stan, however, this assistance would stop. By adopting Elizabeth, the Pruitts continued to receive assistance on her behalf as a dependent. Misty and Stan claimed this was the Pruitts' motivation for the adoption.

the adoption as being in Elizabeth's best interest, and they felt it was in her best interest when they signed the consents.

Although the legislature specifically provided in S.C.Code Ann. § 20–7–1690(E) (Supp.1997) that consent by a minor parent is not subject to revocation on the basis of minority alone, the legislature provided a detailed and elaborate statutory scheme to assure that a parent understands the full implications of the consent document. Thus, section 20–7–1700 sets forth in detail the information which must be contained in a consent form. This includes the admonition that the consenting person forfeits all rights and obligations with respect to the adoptee, and that the entry of the final decree renders the consent irrevocable. S.C.Code Ann. § 20–7–1700(A)(6), (7) (Supp.1997). The execution of the consent must be accomplished in the presence of two witnesses, one of whom must be either a family court judge, a disinterested attorney, or a person certified by the State Department of Social Services. S.C.Code Ann. § 20–7–1705 (Supp.1997). Each of the witnesses must then provide written certification that, before the signature was obtained, the provisions of the document were discussed with the consenting party and, in the opinion of the witness, the consent was given voluntarily and was not obtained through duress or coercion. *Id.* The evidence proves this procedure was followed here.

It is not unusual for family members to be instrumental in the decision of a minor parent to give their child up for adoption. Quite often the decision is premised on the inability of the parents to meet the basic financial and emotional needs of the child. Certainly, the consequences of this decision are amplified for the natural parent who continues to live with the adoptive parents and child, assuming a parental role with the adoptee. But to set aside an adoption decree solely on the basis of a later assertion by the minor parent that they were promised the decree was not, in fact, final and irrevocable, would undermine the finality of adoption proceedings and ignore the efficacy of the elaborate, protective measures statutorily provided to minor parents. There is no evidence to substantiate a conclusion that Misty's father had such a dominating effect on her, such that she was deprived of the opportunity to be heard.

In *Center v. Center*, 269 S.C. 367, 237 S.E.2d 491 (1977) our supreme court stated the following principle:

> Although a judgment obtained by fraud may be set aside by a court of equity "[a]s a general rule, equity will grant no relief to one against whom an unfavorable judgment has been rendered, even in consequence of fraud, where the aggrieved party could have prevented the return of such a judgment by the exercise of proper diligence ..." *Lewis v. Lewis*, 228 Ga. 703, 187 S.E.2d 872, 873 (1972). *Barnes v. Milne*, 9 S.C.Eq. (Rich.Cas.) 459 (1830); *Sullivan v. Shell*, 36 S.C. 578, 15 S.E. 722 (1892); *see also* 49 C.J.S. *Judgments* § 363; 46 Am.Jur.2d *Judgments* § 857.

*Id.* at 373, 237 S.E.2d at 494 (citation omitted). That principle is applicable here.

## C. IMPROPER MOTIVE

The trial court was swayed by the conclusion that the Pruitts misled the court in the adoption proceeding as to the genuineness of their concern for Elizabeth's interests, finding instead that they were motivated by the financial interest of gaining a dependent.

In my view, this is not an allegation of extrinsic fraud, since the child's best interests were at the very heart of the issues involved in the adoption proceeding. The decree having been issued more than one year prior to the commencement of this proceeding, I agree with the majority that the court erred in granting relief on the basis of this allegation. *See* S.C.Code Ann. § 20–7–1800 (Supp.1997).

For the above stated reasons, I would reverse.