59 P.3d 1233 (2002)
BIRTH MOTHER, Appellant,
v.
ADOPTIVE PARENTS and New Hope Child and Family Agency, Respondents.
No. 38572.
Supreme Court of Nevada.
December 27, 2002.
Lee T. Hotchkin Jr., Reno, for Appellant.
Gamboa & Stovall, Reno, for Respondents.
BEFORE THE COURT EN BANC.

OPINION
By the Court, SHEARING, J.:
This case involves an agreement between the appellant, birth mother, and the respondents, adoptive parents and New Hope Child and Family Agency (New Hope), which allowed the birth mother continuing contact, after the adoption, with the adopted child. All parties consented to the agreement. After *1234 the birth mother attempted to terminate her relinquishment of the child for adoption, the adoptive parents refused to continue to allow the birth mother contact with the child.[1]
The birth mother filed a complaint alleging several claims, including breach of contract, based on the adoptive parents' noncompliance with the communication agreement. The adoptive parents and New Hope filed a motion to dismiss, which the district court granted. The birth mother appealed.

FACTS
Prior to relinquishing custody of her child, the birth mother executed a document with New Hope entitled "Agreement Regarding Communication With And/Or Contact Between Birth Parents, Child Adoptee, and Adoptive Parents" (communication agreement), which New Hope had prepared. The communication agreement stated that the birth mother, her ex-husband, and New Hope "entered into a post adoption communication and contact agreement which is in the child's best interests." With New Hope's assistance, the birth mother selected the adoptive parents, and after meeting them, she relinquished her parental rights and consented to the adoption. The adoptive parents signed the communication agreement, which required that any prospective adoptive parent of the child agree to and abide by its terms.
Pursuant to the communication agreement, the adoptive parents agreed to call the birth mother when they first got home with the child and then once a month for the first three months the child was in their custody. The adoptive parents further agreed to provide the birth mother with pictures of the child and letters detailing her progress. The adoptive parents agreed that the birth mother could request photos every six months. They also consented to allow the birth mother to visit the child on or near each of the child's first three birthdays and to send the birth mother a videotape when the child started walking.
The adoptive parents were complying with the communication agreement when they filed their petition to adopt the child. However, shortly thereafter, the birth mother filed a motion objecting to the adoption and demanding that the adoptive parents return the child to her. Thereafter, the adoptive parents no longer permitted the birth mother contact with the child. The district court denied the birth mother's motion and later granted the adoptive parents' petition to adopt the child.
Subsequently, the birth mother filed a complaint against the adoptive parents and New Hope seeking specific performance of the communication agreement or, in the alternative, monetary damages. She alleged breach of contract, unjust enrichment/quantum meruit, breach of the covenant of good faith and fair dealing, interference with contractual relations, emotional distress, and negligent or intentional misrepresentation. The adoptive parents and New Hope filed a motion to dismiss.
Without holding a hearing, the district court entered its order granting the motion to dismiss. The district court stated that "according to NRS 127.160 an adoption completely abrogates the legal relationship between a child and his natural parents." An adoption decree was entered for the adoption of the birth mother's child. The district court explained that the adoption decree is "the final and only document governing the terms of adoption," and therefore, the birth mother needed to seek relief under the adoption decree. Because the adoption decree did not refer to the communication agreement, and is the sole document governing the adoption, it provided no relief for the birth mother as to claims involving the communication agreement. Accordingly, the district court dismissed the birth mother's complaint *1235 for failure to state a claim upon which relief can be granted.

DISCUSSION
This court reviews a district court's conclusions of law, including statutory interpretations, de novo.[2] Although Nevada does not have a statute that expressly addresses the issue of post-adoption contact, unlike a number of other states,[3] NAC 127.210(4)(c) does state that a child-placing agency "[m]ay offer open adoptions in which ... [c]ontact between the adoptive family and biological parent may be arranged, if that contact is agreed upon by all persons involved." The regulation does not explicitly provide for post-adoption contact; however, it could be interpreted to permit agreements allowing such contact, especially because we conclude that these agreements do not per se violate Nevada's public policy of protecting a child's best interests. Yet, even if NAC 127.210(4)(c) encompasses these agreements, Nevada law fails to provide enforcement for such agreements. In other jurisdictions, agreements allowing post-adoption contact, while not prohibited, are also not enforceable absent specific statutory provisions.[4] We conclude, therefore, that without such a specific Nevada statutory provision, the agreement between the birth mother and the adoptive parents is unenforceable.
Further, Nevada law makes it clear that an adoption decree terminates all rights of the natural parent and confers such rights upon the adoptive parents.[5] NRS 127.160 addresses the rights and duties of adopted children and adoptive parents. It provides that:
Upon the entry of an order of adoption, the child shall become the legal child of the persons adopting him, and they shall become his legal parents with all the rights and duties between them of natural parents and legitimate child.... After a decree of adoption is entered, the natural parents of an adopted child shall be relieved of all parental responsibilities for such child, and they shall not exercise or have any rights over such adopted child or his property.
We have previously determined that NRS 127.160 "establishes a new legal family for the adopted child and terminates the legal relationship between the child and her natural kindred."[6] Thus, subsequent to an adoption decree, a natural parent has no rights to the child unless provided for in the decree.[7] We conclude that while an agreement may grant a natural parent rights to post-adoption contact, enforcing it would be inconsistent with the Legislature's mandate that a natural parent may not exercise any right to the adopted child not incorporated in the adoption decree.[8]
This decision leads to an unsatisfactory result in that natural parents may consent to an adoption because, pursuant to an agreement, they believe they have a right to post-adoption contact with the child.[9] However, *1236 what many of these natural parents fail to realize is that, if the agreement is not incorporated in the adoption decree, their rights as to the child are terminated upon adoption and any contact with the child may be had only upon the adoptive parents' permission, regardless of the agreement. Despite this unfortunate result, this court cannot enforce such an agreement until the Legislature mandates otherwise. Because this agreement is unenforceable under Nevada law and the adoption decree governs, the birth mother cannot seek relief based on the agreement. Accordingly, we affirm the judgment of the district court granting the motion to dismiss.
YOUNG, C.J., AGOSTI, LEAVITT and BECKER, JJ., concur.
MAUPIN, J., concurring in part and dissenting in part:
I agree that an agreement allowing post-adoption contact between birth parents and the child relinquished for adoption is unenforceable under the circumstances present in this case. I do not agree with the implication that a district court entering an adoption decree may render such an agreement enforceable by incorporation.
The majority rightly states that, while birth parents and adoptive parents may enter into post-adoption contact agreements, the agreements are unenforceable under NRS 127.160. That is to say, there is nothing to prevent the birth and adoptive parents from making an agreement allowing for post-adoption interaction, but there is no legal remedy for breach. My concern lies with the implication that a district court may create enforceability by incorporating the agreement into the formal decree of adoption. This, in my view, likewise violates the public policy statement embodied in NRS 127.160:
Upon the entry of an order of adoption, the child shall become the legal child of the persons adopting him, and they shall become his legal parents with all the rights and duties between them of natural parents and legitimate child.... After a decree of adoption is entered, the natural parents of an adopted child shall be relieved of all parental responsibilities for such child, and they shall not exercise or have any rights over such adopted child or his property.
Entry of a decree of adoption completes the process by which the birth parents are relieved and divested of any rights to the relinquished child.[1] Until the legislature changes this, neither the parties nor a district court have the power to enforce such an agreement.
ROSE, J., dissenting:
I disagree with the majority's conclusion that the contract allowing the birth mother continued contact with the adopted child is unenforceable. The majority's decision abrogates the appellant's freedom to contract, which this court should refrain from doing unless absolutely necessary.[1]
As the majority notes, NAC 127.210(4)(c) authorizes child-placing agencies to offer open adoptions allowing continued contact between the adoptive family and the biological parent. Additionally, on its face, NRS 127.160 does not prohibit agreements like those permitted by NAC 127.210(4)(c). Thus, Nevada has no laws forbidding the continued contact agreement that these parties freely entered into prior to the adoption;[2] and, in fact, Nevada expressly permits such agreements.
*1237 I also believe it is patently unfair to have a biological parent agree to the adoption of her or his child on the basis that continued contact will be permitted, but upon approval of the adoption, refuse to enforce the continued contact agreement. A parent may specifically agree to an adoption of a child based on the ability to have periodic contact with the child. The enforcement of the adoption agreement without also recognizing the contact provision leaves the biological parent with an adoption she or he never would have agreed to otherwise. We should not permit birth parents to be so misled.
Accordingly, I conclude that considerations of both fairness and freedom to contract justify the enforcement of the continued contact agreement.[3] Whether a natural parent has breached the continued contact agreement or relinquished the right to continue contact is an issue left to another day.
Therefore, I respectfully dissent.
NOTES
[1] The parties to this appeal are also parties to an appeal in Docket No. 37244, which challenges the adoption decree. See Matter of Adoption of Minor Child, 118 Nev. ___, 60 P.3d 485 (2002). Although the instant appeal is not subject to the confidentiality provisions of NRS 127.140, we have nonetheless altered the caption in this appeal and used non-identifying references to the birth mother, adoptive parents, and adopted child so that the confidentiality required in Docket No. 37244 will not be undermined.
[2] Madera v. SIIS, 114 Nev. 253, 257, 956 P.2d 117, 120 (1998); Bopp v. Lino, 110 Nev. 1246, 1249, 885 P.2d 559, 561 (1994).
[3] See Cal. Fam.Code § 8714.7 (West Supp.2002) ("Postadoption contact agreements"); Mass. Ann. Laws ch. 210, § 6C (Law. Co-op.1994 & Supp.2002) ("Agreement for Post-Adoption Contact or Communication"); Minn.Stat. Ann. § 259.58 (West Supp.2002) ("Communication or contact agreements"); Mont.Code Ann. § 42-5-301 (2001) ("Visitation and communication agreements"); Neb.Rev.Stat. § 43-162 (1998) ("Communication or contact agreement; authorized; approval"); Or.Rev.Stat. § 109.305 (2001) ("Interpretation of adoption laws; agreement for continuing contact").
[4] See Annette R. Appell, Enforceable Post-Adoption Contact Statutes, Part I: Adoption with Contact, 4 Adoption Q. 81, 83 (2000).
[5] See NRS 127.160; Bopp, 110 Nev. at 1250, 885 P.2d at 562.
[6] Bopp, 110 Nev. at 1250, 885 P.2d at 562.
[7] Id.; NRS 127.160.
[8] See NRS 127.160; see, e.g., Lowe v. Clayton, 264 S.C. 75, 212 S.E.2d 582, 586-87 (1975) (holding that an adoption decree foreclosed enforcement of a prior contact agreement because the final adoption terminated all rights of the natural parent), superceded by statute on other grounds as stated in Hagy v. Pruitt, 331 S.C. 213, 500 S.E.2d 168 (S.C.Ct.App.1998).
[9] In such a situation, natural parents may attempt to contest the validity of their consent to an adoption by arguing mistake of fact. To avoid this issue in the future, agencies should inform natural parents of the need to incorporate the agreement into the adoption decree if their consent is conditioned upon post-adoption contact.
[1] See Bopp v. Lino, 110 Nev. 1246, 885 P.2d 559 (1994).
[1] See My Fair Lady of Georgia v. Harris, 185 Ga.App. 459, 364 S.E.2d 580, 581 (1987) (observing that public policy requires that courts "not lightly interfere with the freedom of parties to contract" (internal quotation marks omitted)); Zerr v. Zerr, 7 Neb.App. 885, 586 N.W.2d 465, 470-71 (1998) (concluding that because the agreement was fair and did not interfere with the district court's duty to independently scrutinize the property, child custody, or child support issues, the parties' freedom to contract would be unreasonably inhibited if such an agreement was not enforced).
[2] See Veness v. Midland Risk Ins. Co., 732 N.E.2d 209, 211 (Ind.Ct.App.2000) (concluding that the importance of the freedom to contract demands that the court not find a contract unenforceable unless it contravenes the clear and unambiguous language of the statute).
[3] See Miller v. A & R Joint Venture, 97 Nev. 580, 582, 636 P.2d 277, 278 (1981) (concluding that public policy does not require that an exculpatory lease provision not be enforced when it was freely contracted to by the parties and was thus a valid exercise of their freedom to contract); see also Home Shopping Club v. Roberts Broadcasting, 989 S.W.2d 174, 179 (Mo.Ct.App.1998) (observing that it is in the public's best interest to enforce contractual rights and obligations when parties exercise their freedom to contract within the confines of the law).