2005 ME 123

**In re THOMAS H. et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 14, 2005.
Decided: Dec. 14, 2005.

G. Steven Rowe, Attorney General, Matthew E. Pollack, Asst. Atty. Gen. (orally), Lise Wagner, Asst. Atty. Gen., Augusta, for appellant.

Diane Edgecomb, Esq. (orally), Gorham, Joseph M. Wrobleski Jr., Esq. (orally), Saco, for appellees.

Glenda Lovell, Esq. (orally), Kennebunkport, Guardian ad Litem.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, and SILVER, JJ.

Dissenting: DANA, and CALKINS, JJ.

LEVY, J.

[¶ 1] The Department of Health and Human Services appeals from the judgment of the District Court (Springvale, *Foster, J.*) denying a petition to terminate the parental rights of Thomas H. and Holly L. to their two children pursuant to 22 M.R.S.A. § 4055 (2004). Although the court found the parents unfit, it concluded that it was not in the best interests of the children to terminate the parents' parental rights. The Department contends that the court abused its discretion by not giving sufficient weight to the statutory policy of permanency in 22 M.R.S.A. § 4050 (2004). The mother cross-appeals, challenging the sufficiency of the evidence as to the court's finding of her unfitness. We conclude that the court's parental unfitness findings were supported by clear and convincing evidence and, accordingly, we deny the mother's cross-appeal and affirm those findings of the court. Because we agree with the Department's contention that the court's best interest determination failed to give sufficient weight to the statutory policy favoring permanency, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

[¶ 2] Thomas H. and Holly L. are the parents of a boy, Thomas, Jr., who is now seven years old, and a girl, Rose, who is five. The Department filed a petition for a child protection order five years ago. Jeopardy was found as to the father based on his history of substance abuse and domestic violence. The court found no jeopardy as to the mother, and she was awarded custody of the children. The father was given the right to have contact with the children but only under the direction of the Department.

[¶ 3] Some time later, the mother left the children with the father, who took them to the Department. In June 2001, the Department requested and obtained a preliminary protection order granting it custody of the children, who were placed in foster homes. Thomas resided in a foster home until the Department placed him with his maternal grandmother, where he remained for approximately one year before the Department placed him in the same foster home with Rose.

[¶ 4] A determination of jeopardy as to the mother was not made until April 2002, when the parties agreed that there was jeopardy based on the mother's "past child protective history as well as her ongoing mental health issues," which the court found she appeared to be addressing appropriately at that time. The court ordered reunification efforts with the mother and the father to continue. In March 2003, the court allowed the Department to

cease reunification with the father but not the mother.

[¶ 5] The Department later filed a petition to terminate the parental rights of both parents, and a two-day hearing on the petition was held in June 2004. The hearing on the petition was consolidated with a judicial review and a permanency planning hearing. The court heard from numerous witnesses, including the mother and father; two Department caseworkers; two visitation supervisors; the foster mother; the mother's psychiatrist; and three licensed clinical social workers: the mother's counselor, the father's counselor, and the boy's counselor. The guardian ad litem submitted a written report and participated in the examination of witnesses, but did not testify.

[¶ 6] The court issued extensive written findings, utilizing a clear and convincing evidence standard of proof. It found that both parents were unable to protect the children from jeopardy. With regard to the father, the court found that he had done nothing to resolve his issues of substance abuse and domestic violence. He had refused to participate in the Violence No More program, he had stopped taking his medication for depression, and on a number of occasions he cancelled or failed to appear at his counseling sessions. As of the fall of 2003, when he was jailed for violating probation, he was possibly still abusing drugs, although he denied any substance abuse since that time. He did complete a parenting program. The father was not requesting that the children be placed with him, but only that he continue to have contact with them.

[¶ 7] With regard to the mother, the court detailed the mother's propensity to become involved in relationships with men who either abused her or were known substance abusers. It also discussed the mother's relationship with an older son, now an adult, who had been removed from her home when he was twelve. The mother knew that the older son had been in jail as an adult and had abused drugs, but she saw no problem with her younger children having contact with him.

[¶ 8] In other respects, the mother had shown substantial improvements. She had maintained a relationship with the children. They visited with her all day every Saturday and Sunday, with a supervisor checking in periodically on Saturdays. She had learned to set and enforce limits for the children and had become more adept at addressing their needs. She attempted to establish a support network and obtained a part-time job. The court found that she had engaged in virtually every service that the Department had offered her. Other than a finding that the mother's mood was more stable, the court made no findings about the mother's mental health issues that had led to the original finding of jeopardy.

[¶ 9] It was the mother's inability to identify individuals that presented a risk of harm to her children or to take steps to avoid involvement with them, even at a time while she had the benefit of a therapeutic setting, that led the court to conclude that she was unable to protect the children from jeopardy. The court also concluded that there were no further efforts, other than those already made, "that could reasonably be expended to address the risks which each parent presents." Based on that assessment, the court found that the parents would not be able to protect the children from jeopardy within a time reasonably calculated to meet their needs.

[¶ 10] Concerning the best interests of the children, the court discussed Thomas's situation in detail. His counselor, whom he had been seeing since June 2003, testified that he had recently been diagnosed

with Attention Deficient Hyperactive Disorder and that a major transition would be very difficult for him. The court found that Thomas and Rose spend all day Saturday and Sunday with their mother, and that a substantial part of that time is also spent with the maternal grandmother. The court reported that the counselor did not support termination of the mother's parental rights.[1] The court found that Thomas thrives in the foster home, where he has been since October 2002, and that the foster parents want to adopt both children.

[¶ 11] The court's findings regarding Rose were more limited. There was very little evidence presented about her except that she was a normal baby when she first came into the current foster home at age eleven months and that she has not needed any special assistance.

[¶ 12] The court had numerous guardian ad litem reports that had been filed throughout the case, with the last one dated a day before the termination hearing. The current guardian ad litem, who replaced the first guardian, began recommending termination of parental rights with her first report in 2003. In her final report, the guardian again recommended termination of the rights of both parents, reporting that "Holly is apt to substitute her own judgment for professional judgment regarding the children and [is] not ... able to work with the children's counselor ... [and] continues to involve Tommy in deciding where he is to live, despite being told [of] the burden this places on him." With respect to the children's foster family, the guardian noted: "Clearly the children are bonded and a part of this family which wants to adopt them."

[¶ 13] The court concluded that the Department had failed to establish by clear and convincing evidence that termination of the parents' parental rights was in the children's best interest because it found the children's needs were being met by their foster home placement and continued

---

1. Although the counselor testified that Thomas's ties to the mother should be maintained, she was not directly asked to give an opinion regarding Thomas's long-term permanency needs. Rather, in response to the court's questions, she testified that she could find "no written authority ... to figure out what to do with the kids in limbo" and that Tommy's relationship with the mother was "very positive" and that he says "he loves his visits with her." The counselor then testified as follows:

> COURT: Well, you talked about, uh, Tommy being in—in limbo. I mean, he is in a, what you have described as, apparently, a nurturing, appropriate foster placement.
> WITNESS: He does [sic].
> COURT: He enjoys contact with—
> WITNESS: Yuh.
> COURT:—his mother?
> WITNESS: Yuh.
> COURT: And so, I guess the natural question is, why not continue that indefinitely until that system doesn't work any longer for him?
> WITNESS: There's an idea. I don't—I don't have a problem with that idea.

> COURT: Well, are you—is there any sort of immediacy, from Tommy's viewpoint, about getting this resolved in some fashion?
> (PAUSE)
> WITNESS: You're strictly talking about the child's viewpoint?
> COURT: Correct.
> WITNESS: Um, probably not. I think Tommy is very happy with the way things are.
> COURT: Do you have any sense that he sees this as something that is impermanent?
> WITNESS: He's been very anxious, um, that—he—he knows a little bit about, um, what was—what is happening. Um,—
> COURT: Do you know how he knows that?
> WITNESS: Uh, some of it, I did tell him I was going to court. Um—um, and some of it's he's, um, been asked by people, you know, where he would like to live, and I think, um, people have talked to him about that. Um—(PAUSE)—from Tommy's perspective, I think Tommy is happy with the current arrangements.

contact with their mother and maternal grandmother:

> [I]t is not clear that termination of [the mother's] rights is in the best interest of [the children]. Perhaps in spite of this process, those children have reached equilibrium. They are cared for in a loving home that meets their physical and emotional needs, ensures their safety, and provides them with security sufficient to deal with the world as it is currently constituted, including ongoing and extended visitation with their mother. Neither child is in need of special services or presents, at this time, with behaviors that could be attributed, rightly or wrongly, to the impermanence of foster care. They enjoy a continued connection with their family of origin, including their maternal grandmother, even as they benefit from the care and support which that family is unable to provide. I[n] what way could terminating this balance be in [the children's] best interest?
>
> The Court is fully aware that such balance could be disrupted in short order and with a vengeance. Any one of the adult participants could opt out of this construct, or change his or her behavior. As is pointed out so often in cases of this nature, there are virtually no guarantees one can offer to children in foster care absent a termination of parental rights. However, in this case, at this time, the value of such a guarantee is outweighed by the benefits of sustaining, if at all possible, the current state of affairs.

(Footnote omitted.)

[¶ 14] The court denied the petition for termination of parental rights. It relieved the Department of its reunification obligation to both parents. It ordered that the children remain in the custody of the Department, and it requested that the children remain in the current foster home. The court ordered the Department to continue to make visitation available to the mother and to the father, and stated that "it is imperative that every effort be made to continue and support the strong connection between [the mother] and the children[.]" The permanent plan for the children ordered by the court was continued custody with the Department and placement in the current foster home. *See* 22 M.R.S.A. § 4038(7–A)(B)(1)(d) (2004). In addition, the court encouraged the Department and the foster family to explore the possibility of the foster family accepting custody or legal guardianship of the children in order "to enhance the stability of the placement and normalize the lives of the children."

[¶ 15] The Department appeals the judgment denying its petition for termination of parental rights, and the mother cross-appeals from the finding that she is unable or unwilling to protect the children from jeopardy, or assume responsibility for them, within a time reasonably calculated to meet the children's needs.

## II. DISCUSSION

### A. Standard of Review

[¶ 16] The Department does not challenge the court's factual findings, but does challenge the court's conclusion made, pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(a), regarding the children's best interest. Although our articulation of the standard by which we review best interest determinations has not been entirely uniform, the standard is twofold: We review the court's factual findings related to the child's best interest for clear error, but its ultimate conclusion regarding the child's best interest for abuse of discretion. *See In re Michaela C.*, 2002 ME 159, ¶ 24, 809 A.2d 1245, 1252 (concluding that there was substantial evidence in the

record to support the court's finding by clear and convincing evidence that the termination of parental rights was in the best interest of the child); *In re Misty Lee H.*, 529 A.2d 331, 333 (Me.1987) (explaining that the trial court's best interest decision was "'entitled to very substantial deference'" because the court heard from the parties and their experts, and it exercised broad discretion in carrying out the "'weighty responsibility[ ] to determine the particularly sensitive question of a child's best interests'") (quoting *Cooley v. St. Andre's Child Placing Agency*, 415 A.2d 1084, 1086 (Me.1980)); *Harmon v. Emerson*, 425 A.2d 978, 984–85 (Me.1981) (stating that the "'delicate balancing'" of the factors as well as the first-hand opportunity to view the people involved meant that appellate review was for abuse of discretion) (quoting *Costigan v. Costigan*, 418 A.2d 1144, 1147 (Me.1980)).

■ [¶ 17] In reviewing the court's exercise of its discretion, "we view the facts, and the weight to be given individual facts, through the trial court's lens." *In re Jazmine L.*, 2004 ME 125, ¶ 13, 861 A.2d 1277, 1280. Furthermore, we afford substantial deference to the trial court's determination. *In re Michaela C.*, 2002 ME 159, ¶ 27, 809 A.2d at 1253; *In re Misty Lee H.*, 529 A.2d at 333.

■ [¶ 18] With regard to the mother's cross-appeal, which is a challenge to the sufficiency of the evidence on the court's unfitness finding, our standard of review is "whether the court 'could have reasonably been persuaded on the basis of the evidence in the record that the required factual findings were highly probable.'"' *In re Kayla M.*, 2001 ME 166, ¶ 6, 785 A.2d 330, 332 (citing *In re Breauna N.*, 1999 ME 191, ¶ 19, 742 A.2d 911, 915).

**B. The Mother's Unfitness**

■ [¶ 19] We address the mother's cross-appeal first because if she is correct in her contention that the evidence was insufficient to establish her unfitness, we would not reach the issue of the best interest of the children.[2] *See In re Scott S.*, 2001 ME 114, ¶ 19, 775 A.2d 1144, 1150–51 (stating that a court must find parental unfitness before it considers the child's best interest).

[¶ 20] The court found that the mother was unable to protect the children from jeopardy and that the circumstances were not likely to change within a time period calculated to meet the children's needs. The court's finding was premised primarily on the mother's inability to identify men who present a risk of harm to herself and the children. The court's findings included descriptions of Aaron and Bill, men with whom the mother had relationships and who had drug problems. Aaron seriously assaulted the mother on at least two occasions and was jailed for six months, but she dismissed the concerns of others about him. The mother was not forthcoming to her counselor or Department caseworkers about Aaron's drug use or her encounter with Bill. Furthermore, there was her continuing relationship with the children's father, for whom jeopardy was found in 2001 due to his history of substance abuse and domestic violence. The court also identified the mother's failure to recognize, despite her knowledge of his criminal record and drug use, that her older son might pose a risk to the other children as more evidence of her inability to either identify people who might be dangerous to the children or to take steps to avoid involvement with them.

[¶ 21] Keeping in mind the superior perspective of the trial court to view and

---

**2.** The father was found to be unfit, but he does not challenge this finding.

weigh the evidence, we conclude that the court could have reasonably been persuaded that it is highly probable that the mother is unable to protect the children from jeopardy. Furthermore, based on the evidence of the length of time that the mother has been in counseling and her continuing difficulty in recognizing when a person is unsuitable for a relationship with her, and thereby with the children, the trial court could have been reasonably persuaded that it is highly probable that the mother's inability to protect the children from jeopardy is unlikely to change within a time that would meet the children's needs.

## C. The Children's Best Interest

[¶ 22] Because we affirm the conclusions regarding the mother's unfitness, we now review the court's conclusion that the Department had failed to prove by clear and convincing evidence that termination is in the best interest of the children. The Department does not question the fact-finding of the court and agrees that the evidence is sufficient to support the facts found by the court. Rather, the Department contends that the court exceeded its discretion in reaching its conclusion that the termination of parental rights was not in the children's best interest by disregarding or giving inadequate weight to the statutory policy of permanency for children. We address this contention by considering (1) the role of permanency in defining the bounds of judicial discretion; and (2) the application of permanency to the circumstances of this case.

### 1. Permanency and the Bounds of Judicial Discretion

[¶ 23] A central tenet of Maine's Child and Family Services and Child Protection Act (the Act), 22 M.R.S.A. §§ 4001–4099–C (2004 & Supp.2004), is that children subject to on-going judicial and departmental involvement in their lives should benefit from permanency.[3] Once a child has been

---

3. The importance of permanency is reflected in section 4003, which provides, in pertinent part:

Purposes

Recognizing that the health and safety of children must be of paramount concern and that the right to family integrity is limited by the right of children to be protected from abuse and neglect and *recognizing also that uncertainty and instability are possible in extended foster home or institutional living,* it is the intent of the Legislature that this chapter:

1. Authorization. Authorize the department to protect and assist abused and neglected children, children in circumstances which present a substantial risk of abuse and neglect, and their families;

2. Removal from parental custody. Provide that children will be taken from the custody of their parents only where failure to do so would jeopardize their health or welfare;

3. Reunification as a priority. Give family rehabilitation and reunification priority as a means for protecting the welfare of children, *but prevent needless delay for permanent plans for children when rehabilitation and reunification is not possible;* [and]

4. Permanent plans for care and custody. *Promote the early establishment of permanent plans for the care and custody of children who cannot be returned to their family.* It is the intent of the Legislature that the department reduce the number of children receiving assistance under the United States Social Security Act, Title IV–E, who have been in foster care more than 24 months, by 10% each year beginning with the federal fiscal year that starts on October 1, 1983; ....

22 M.R.S.A. § 4003 (2004) (footnote omitted) (emphasis added).

The clear intent of the Legislature expressed in section 4003 is that children who cannot be returned to their families should be removed from the instability of foster care and placed in a more permanent environment as soon as the court determines that reunification with their natural parents is no longer safely possible.

found to be in circumstances of jeopardy, the District Court must develop a permanency plan for the child within twelve months from when the child is considered to have entered foster care, and then conduct what amounts to annual reviews. 22 M.R.S.A. § 4038(7–A) (2004).[4] Permanency planning was embraced by Congress in the Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105–89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.A.), in direct response to the documented inability of state child welfare systems to bring about stable and final outcomes for children within a timeframe reasonably designed to meet their needs:

> Child welfare advocates conceived of permanence in the 1970s as a way of tackling the problem of "foster care drift," a term used to describe the shepherding of children through a series of foster homes, sometimes for years, while state agencies attempt to provide the services necessary to enable safe family reunification. Child welfare advocates condemn "foster care drift" as insensitive to children's sense of time and threatening to their future ability to form attachments. The emphasis on permanence was a direct response to this problem.

Libby S. Adler, *The Meanings of Permanence: A Critical Analysis of the Adoption and Safe Families Act of 1997*, 38 HARV. J. ON LEGIS. 1, 2 (2001) (footnotes omitted).[5]

[¶ 24] Even before the codification of permanence as a central tenet of ASFA and the corresponding amendments to Maine child protective laws that took effect in 1998,[6] the Legislature had declared that "instability and impermanency are contrary to the welfare of children," 22 M.R.S.A. § 4050 (1992),[7] and our decisions

---

Section 4003 has recently been amended. *See* P.L.2005, ch. 374, § 1 (effective Sept. 17, 2005).

4. Section 4038(7–A) has recently been repealed and replaced. *See* P.L.2005, ch. 372, § 4 (effective Sept. 17, 2005). The new requirements for permanency plans are now set forth in the newly enacted section 4038–B. *See* P.L.2005, ch. 372, § 6 (effective Sept. 17, 2005).

5. The Report of the House of Representatives Committee on Ways and Means noted that:

> [T]oo many children are subjected to long spells of foster care or are returned to families that reabuse them.... [W]hat is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption.

H.R. REP. NO. 105–77, at 8 (1997). The Committee also stated that one "barrier to adoption has been that States often move slowly in moving children toward permanent settings." *Id.*

6. *See* P.L.1997, ch. 715, §§ A–1–A–12, B–1–B–15, C–1 (effective June 30, 1998) (amending the Act to add, among other sections, section 4038(7–A) to add provisions on permanency planning).

7. *Section 4050, which sets forth the goals of the Act's termination subchapter, currently provides:*

> Purpose
>
> Recognizing that instability and impermanency are contrary to the welfare of children, it is the intent of the Legislature that this subchapter:
>
> 1. Termination of parental rights. *Allow for the termination of parental rights at the earliest possible time after rehabilitation and reunification efforts have been discontinued and termination is in the best interest of the child;*
>
> 2. Return to family. *Eliminate the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family;*
>
> 3. Adoption. *Promote the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care;* and

recognized that placing a child in a "permanent home" is the preferred outcome in child protective proceedings. *See, e.g., In re Serena C.*, 650 A.2d 1343, 1345 (Me. 1994) (noting that need for permanence was established and termination was in best interest of child); *In re Elijah R.*, 620 A.2d 282, 286 (Me.1993) (noting that consideration can be given to "the preference for placing children in permanent homes"); *In re Justin S.*, 595 A.2d 1058, 1060 (Me. 1991) (affirming trial court's holding that termination was in best interest of child where only alternative was "more temporary foster care"); *In re Amanda D.*, 549 A.2d 1133, 1135 (Me.1988) (noting that "the District Court could consider the preference for placing children in permanent homes"); *In re Cassandra B.*, 531 A.2d 1274, 1275 (Me.1987) (holding that consideration can be given to "the preference for placing children in permanent homes"); *In re Misty Lee H.*, 529 A.2d at 333 (observ-

ing "the express statutory policy of placing children in a permanent environment where reunification is not possible").

[¶ 25] Any remaining doubt about the centrality of permanency in child protective proceedings was eliminated with the enactment of ASFA in 1997 and the Maine Legislature's corresponding amendments to Title 22. Pursuant to the 1997 amendments, a court can only adopt a permanency plan that will result in the child remaining in foster care if:

> the department has documented ... a *compelling reason* for determining that it would not be in the best interests of the child to be returned home, be referred for termination of parental rights or be placed for adoption, be placed with a fit and willing relative, or be placed with a legal guardian.

22 M.R.S.A. § 4038(7–A)(B)(1)(d) (emphasis added).[8] This provision indicates that

---

4. Protect interests of child. Be liberally construed to serve and protect the best interests of the child.

22 M.R.S.A. § 4050 (2004) (emphasis added). The legislative history is also consistent with this statutory policy:

> The purpose of this section is to stress the movement toward freeing children for adoption as soon as it is clear that the children will not be able to return to their parents. The section further indicates that the subchapter on termination of parental rights should be liberally construed to serve and protect the best interests of the children involved.

L.D. 2166, Statement of Fact (111th Legis.1984). The purpose of the 1984 legislation "is to assure that children whose lives have been disrupted are provided safe *permanent homes as soon as possible." Id.* (emphasis added).

8. Section 4038(7–A) reads:

> Permanency Planning Hearing. The court shall conduct a permanency planning hearing and shall determine a permanency plan within 12 months of the time a child is considered to have entered foster care

and every 12 months thereafter, unless subsequent reviews are no longer required pursuant to subsection 1–A. If the court's jeopardy ruling includes a finding of an aggravating factor, the court may order the department to cease reunification, in which case a permanency planning hearing must commence within 30 days of the order to cease reunification.

A. A child is considered to have entered foster care on the date of the first judicial finding that the child has been subjected to child abuse or neglect or on the 60th day after removal of the child from home, whichever occurs first.

B. The permanency plan for the child must contain determinations on the following issues.

(1) The permanency plan must determine whether and when, if applicable, the child will be:

(a) Returned to the parent. Before the court may enter an order returning the custody of the child to a parent, the parent must show that the parent has carried out the responsibilities set forth in section 4041, subsection 1–A, paragraph B; that to the court's satisfaction the parent has

the Legislature regarded long-term foster care as inherently impermanent and, absent a compelling reason, contrary to the welfare of children. *See* 22 M.R.S.A. § 4050(3) (2004) (stating that it is the Legislature's intent to "[p]romote the adoption of children into stable families rather than allowing children to remain in the *impermanency of foster care* ") (emphasis added).

[¶ 26] Our decisions also reflect these principles. As recently as 2002, we held, in affirming a termination of parental rights, that "the Child and Family Services and Child Protection Act ... has a clearly stated policy favoring permanency for children." *In re Michaela C.*, 2002 ME 159, ¶ 28, 809 A.2d at 1253. We noted that:

> If the District Court had adopted long-term kinship or foster care as Michaela's permanency plan, it would have been authorized to enter and periodically review orders designed to address actions by Michaela's noncustodial relatives that impact upon her well-being. The utility of this authority, however, must be considered in light of the practical limits on the court's ability to control familial relationships and behaviors. In view of the high level of family conflict demonstrated during the pendency of this case,

the District Court was justified in concluding that its indefinite supervision of Michaela's family relationships would have effectively placed Michaela "in limbo," and would not have achieved the Act's goals of certainty and stability. *Id.* ¶ 29, 809 A.2d at 1253. *See also Adoption of Michaela C.*, 2004 ME 153, ¶ 15, 863 A.2d 270, 274 (noting that the child was "entitled to the implementation of the best permanency plan available").

[¶ 27] Similarly, in *In re Alana S.*, we recognized, in affirming a termination of parental rights, that:

> [t]he purpose statement of the termination of parental rights law includes the Legislature's statement of intent to "[e]liminate the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family," and to "[p]romote the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care[.]"

2002 ME 126, ¶ 21, 802 A.2d 976, 981 (internal citations omitted). Additionally, in *In re Kafia M.*, we noted, in holding that the child should not be forced to wait indefinitely in an impermanent foster care

---

rectified and resolved the problems that caused the removal of the child from home and any subsequent problems that would interfere with the parent's ability to care for and protect the child from jeopardy; and that the parent can protect the child from jeopardy;
(b) Placed for adoption, in which case the department shall file a petition for termination of parental rights;
(c) Referred for legal guardianship; or
(d) Placed in another planned permanent living arrangement when the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to be returned home, be referred for termination of parental rights or be placed for

adoption, be placed with a fit and willing relative, or be placed with a legal guardian.
(2) In the case of a child placed in foster care outside the state in which the parents of the child live, the permanency plan must determine whether the out-of-state placement continues to be appropriate and in the best interests of the child.
(3) In the case of a child who is 16 years of age or older, the permanency plan must determine the services needed to assist the child to make the transition from foster care to independent living.
C. The court shall consider, but is not bound by, the wishes of the child in making a determination under this subsection if the child is 12 years of age or older.

arrangement, that "[f]or all children, permanency and stability are legislatively mandated goals, and the impermanency of foster care is to be avoided." 1999 ME 195, ¶ 15, 742 A.2d 919, 925.

[¶ 28] The 1997 legislative amendments to the Act bear directly on the scope of judicial discretion associated with a best interest determination made in a parental termination case. A court-approved permanency plan is a required part of the statutory framework. *See* 22 M.R.S.A. § 4038(7–A). Because the statute directs that the court "shall determine a permanency plan" it is not sufficient for the Department to prepare a plan and for the court's permanency planning order to merely memorialize the parties' positions regarding the permanency plan for the child or children. *Id.*[9] Permanency planning and the best interest determination made in a termination proceeding cannot be divorced from one another because a best interest decision necessarily requires the court to consider the long-term living arrangement that will best serve a child's needs. The court's permanency plan for the child is an inextricable part of that decision.

[¶ 29] Logic dictates that the public policy favoring permanency is not only vitally important at the permanency planning stage, but also at the termination stage. Indeed, as a matter of practicality, many termination hearings, including this one, are consolidated for hearing with permanency planning hearings. As a result, the court considers a single body of evidence in making both its termination related best interest decision and in crafting its permanency plan. The Act, our decisions, and practice all reinforce the fundamental principle that the strong public policy favoring permanency for children must inform the trial court's exercise of judicial discretion associated with determining a child's best interest, as well as any subsequent appellate review. *See* Andrew M. Mead, *Abuse of Discretion: Maine's Application of a Malleable Appellate Standard,* 57 ME. L. REV. 519, 527 (2005) (observing that trial court "decisions concerning wide-ranging policy issues are accorded significantly less deference" on appellate review).

[¶ 30] For these reasons, courts must consider the statutorily mandated concept of permanency when making best interest determinations pursuant to section 4055, and, as established in section 4038(7–A)(B)(1)(d), must specifically determine whether a compelling reason exists that supports a disposition that will result in long-term foster care.[10] The compelling

---

9. Here, however, the permanency planning order entered in September 2003, which preceded the termination hearing, only memorialized the Department's position, stating: "The Department intends that the permanency plan be adoption and has filed a petition to terminate parental rights."

10. Requiring the trial court to consider permanency and whether a compelling reason exists as to support long-term foster care is further supported by 22 M.R.S.A. § 4064 (2004). Section 4064 provides in pertinent part:

   1. Defined. "Long-term foster care" means a foster family placement for a child in the custody of the department in which the department retains custody of the child while delegating to the foster parents the duty and authority to make certain decisions. The placement is intended to continue until the child becomes 18 years old, unless altered or terminated in the best interests of the child.

   2. Authority for placement. The department may place in *long-term foster care* a child in its custody, if:

   A. The child had been in foster care for 6 months or parental rights have been terminated;

   B. The department has decided that it is not likely that the child can be returned to his parents and has so notified the parents; [and]

reason requirement ensures compliance with the favored policy of permanency. This approach is critical because the best interest determination does not occur in a vacuum, but rather is part of an ultimate disposition that must account for the congruence of the judicial decisions—including the permanency planning order—associated with it. *See In re Scott S.*, 2001 ME 114, ¶ 12, 775 A.2d at 1149 (recognizing that child protection cases are in essence a unified proceeding when the same judge has heard the evidence at prior stages, and noting that if a different judge presides at a later proceeding, the judge can rely on prior conclusions of law and findings of fact).

### 2. Permanency as Applied to Thomas and Rose

[¶ 31] The court's best interest analysis regarding Thomas and Rose focused on the positive attributes of their current foster placement and continued contacts with their family of origin. The court emphasized that the children's needs are being met in a loving foster home; that they are not exhibiting problem "behaviors that could be attributed, rightly or wrongly, to the impermanence of foster care[;]" and that "[t]hey enjoy a continued connection with their family of origin." In essence, the court found that the children were *currently* safe and having their needs met, but that they could not be returned to the care of either parent because both are incapable of protecting the children from jeopardy. This analysis did not also weigh, however, the farther-reaching consequences of long-term foster care.

[¶ 32] Maintaining the status quo because "children have reached equilibrium" or because they do not currently need special services is not, without more, a compelling reason sufficient to warrant long-term foster care. As previously noted, section 4038(7–A)(B)(1)(d) provides that a permanency plan adopting foster care as the child's permanent placement must document that "a compelling reason" exists for concluding "that it would not be in the best interests of the child to be returned home, be referred for termination of parental rights or be placed for adoption, be placed with a fit and willing relative, or be placed with a legal guardian." Accordingly, when a court applies the factors set forth in section 4055(2) [11] to determine the best interest of a child for whom the court is considering the alternative of long-term foster care, it must address whether a compelling reason supports its conclusion that long-term foster care will serve the child's best interest over both the short and long-term. Here, the best interest analysis did not address the long-term consequences impermanence might have for Thomas and Rose, and did not identify a compelling reason supporting long-term foster care. Nor was a com-

---

> C. In the judgment of the department, it is not likely that the child can be placed in an adoptive home; . . . .

22 M.R.S.A. § 4064 (emphasis added). In this case, the Department, had it sought to do so, would not have been able to place Thomas and Rose in long-term foster care because the third prong would not have been met. In an order after Judicial Review and Permanency Planning dated September 19, 2003, the court noted that the Department intended the permanency plan to be adoption.

11. The statutorily mandated factors that a court must consider, which are called "[p]rimary considerations," are "the best interest of the child, the needs of the child, including the child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs." 22 M.R.S.A. § 4055(2).

pelling reason identified in the permanency plan portion of the court's judgment.[12]

[¶ 33] One certain consequence of long-term foster care is that the court will retain continued supervisory responsibility for major decisions affecting the children, and that the exercise of that responsibility will be subject to the procedures and pace of the judicial process. Here, approximately sixteen months passed between the time the State petitioned to terminate the parents' parental rights and the time the court determined that the petition should be denied. Approximately ten months have passed between the filing of the first notice of appeal and the issuance of this opinion. This is not an unusually long period of time as measured by the pace of complex litigation. In the lives of pre-adolescent children, however, twenty-six months, or more than two years, is an eternity. *See In re Hope M.*, 1998 ME 170, ¶ 5, 714 A.2d 152, 154 (noting that the child's needs govern the timeframe for evaluation of best interest). Uncertainty as to the outcome of protracted litigation can be detrimental to children, and can interfere with the ability of the child's custodians and caregivers to assist the child.[13] The limitations inherent in the indefinite judicial supervision of a child's life provide additional support for requiring that a compelling reason should be identified before long-term foster care is adopted as the child's permanent placement.

[¶ 34] The court's best interest findings acknowledged that its permanency plan for the children—foster care—"could be disrupted in short order and with a vengeance ... [and that] there are virtually no guarantees one can offer to children in foster care absent a termination of parental rights." Nonetheless, the court concluded "the value of such a guarantee is outweighed by the benefits of sustaining, if at all possible, the current state of affairs." The "guarantee" the analysis refers to is the promise of permanence and the stability and continuity that flow from it. The record does not support a conclusion that the court implicitly found that the benefits of long-term foster care so outweighed the value of other, more permanent, alternatives in this case as to constitute a compelling reason to maintain the status quo.

## III. CONCLUSION

[¶ 35] A best interest determination involving young children who have already spent years living in foster care, and cannot return home, should not rest primarily on how well they are doing in foster care at the current time, but rather on the broader question of their short-and long-term needs to establish stable relationships and a permanent place for themselves in the world. Where, as here, parents are found to be incapable of protecting their children from jeopardy after more than four years of services by the State, a reason more compelling than a

---

12. The order states that:
   [p]ursuant to 22 M.R.S.A. § 4038(7–A), the Court makes the following determinations: (1) The children shall not [be] returned to either parent; (2) The children shall not be placed for adoption; (3) The children shall not, at this time, be referred for legal guardianship; (4) The children shall, at this time, be placed in another planned permanent living

arrangement, specifically, remain in the custody of the Department and placed in the current foster home.

13. Here, for example, Thomas's counselor testified that she was hampered during this period in her ability to counsel and assist Thomas because of the uncertainty associated with where and with whom he would ultimately be living. She also testified that the uncertainty was making him "very anxious."

finding that the children are currently doing well in foster care and enjoying a continued connection with their family of origin is required before the children are consigned to the instability and impermanence of long-term foster care.

[¶ 36] Because we have not previously articulated the need for courts to address the compelling reason standard when rendering best interest findings in a case such as this, the court could not have anticipated the requirement in this case.[14] Accordingly, we vacate the judgment as it relates to the court's best interest determination, and remand for the court to reconsider whether a compelling reason establishes that the continued impermanence of long-term foster care is in the best interests of Thomas and Rose. In light of the passage of time, the court may, in its discretion, receive additional evidence regarding this issue on an expedited basis.

The entry is:

The judgment is affirmed with respect to the mother's cross-appeal. The judgment is otherwise vacated and the case is remanded for further proceedings consistent with this opinion.

CALKINS, J., with whom DANA, J., joins, dissenting.

[¶ 37] I respectfully dissent. I write separately because I would affirm the judgment. In my view, the trial court followed the statute as enacted by the Legislature, its decision is supported by the evidence, and it did not abuse the discretion granted to it.

[¶ 38] Although I agree with that portion of the Court's opinion regarding the standard of review, I disagree with the new requirement that the Court has engrafted onto the parental rights termination statute, effectively amending the statute. The new requirement provides that a court, when "considering the alternative of long-term foster care, [ ] must address whether a compelling reason supports its conclusion that long-term foster care will serve the child's best interest over both the short and long-term." While I understand the reasons for the Court's creation of the new requirement, I believe it is up to the Legislature to determine whether the new requirement is warranted.

[¶ 39] Furthermore, even assuming that the new requirement is encompassed by the existing statutory language, I believe that the trial court addressed the issue and concluded that a compelling reason supported its decision to place the children in long-term foster care.

[¶ 40] The Court discusses the history of the policy of permanency and the statutory requirement of permanency planning, and I agree that there is no question that the federal and state statutes place an emphasis on permanency. The trial court acknowledged that permanency is a goal, but it also recognized that it is not the only goal of the child protection statutes. Although there is a policy favoring permanency, and although a child's need for permanency and stability is a factor to be taken into consideration in determining the child's best interest, neither the statutes nor our precedent make it the only factor. In fact, section 4055(2) lists the "[p]rimary considerations" that a court must consider: "the best interest of the child, the needs of the child, including the child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home

---

14. Contrary to the suggestion of the dissent, the requirement that the court articulate the compelling reason to continue an imperman-ent permanency plan does not create a "presumption."

and the child's physical and emotional needs." 22 M.R.S.A. § 4055(2) (2004). Permanency is not listed among the "primary considerations," but the Court would have permanency trump these other factors.

[¶ 41] There is no statutory presumption that termination is in the child's best interest when reunification with the family of origin is no longer possible or appropriate and an adoptive parent has been identified. The Legislature did not create such a presumption. Instead, it listed factors for a court to consider and weigh in making a determination regarding termination. If it had intended permanency to be the only factor for a court to consider, it would not have listed the factors in section 4055(2).

[¶ 42] By requiring a court to articulate the compelling reason or reasons that long-term foster care is in the child's best interest, the Court is creating a presumption that termination of parental rights is in a child's best interest when reunification with the family of origin is no longer possible or appropriate and a potential adoptive parent has been identified. Under the Court's decision today, it is not clear how or when the court would apply the factors listed in section 4055(2). The new requirement, and the presumption it creates, has the effect of putting the cart before the horse—that is, determining whether adoption is appropriate before determining whether parental rights should be terminated. This is in contrast to the statutory scheme, which makes termination of parental rights a totally separate proceeding from the adoption process.[15]

[¶ 43] In this case the trial court took the factors listed in section 4055(2) into consideration. With regard to the children's needs, it noted that Thomas's counselor had testified that a major transition for Thomas would be difficult at this point. Neither child needed special treatment caused by the impermanence of foster care and neither exhibited behaviors that could be attributed to such. The court noted the ages of the children but did not make any particular findings as to how their ages may have figured into the equation.

[¶ 44] Concerning the factor in section 4055(2) of "the child's attachments to relevant persons," the court discussed the children's, and in particular Thomas's, relationship with their mother. It noted that Thomas's counselor said he appeared happier after the visits with his mother became longer. The counselor recommended against termination and felt that Thomas's ties with his mother should be maintained. The court also found that Thomas had a comfortable, loving, relationship with his foster family and considered himself to be a part of that family.

[¶ 45] With regard to the factor of "the child's ability to integrate into a substitute placement or back into the parent's home," the court properly did not consider placement with the mother as the court had found that she could not protect the children from jeopardy. There was no suggestion of any other placement for the children other than the current foster family.

[¶ 46] It is apparent throughout its finding that the trial court was concerned with, and took into consideration, the children's "physical and emotional needs." In particular, the court was concerned about Thomas's ties to the mother, and the emotional

15. It is the Probate Court that has jurisdiction over adoptions. Before an adoption can be finalized, the Probate Court is required to find that the adoption is in the best interests of the adoptee. 18–A M.R.S.A. § 9–308(a)(5) (1998). The factors to be considered in making that determination are listed in 18–A M.R.S.A. § 9–308(b) (1998 & Supp.2004).

disruption that could be caused by severing those ties.

[¶ 47] The court did not neglect permanency and was troubled by the impermanence that the current situation allows. Nonetheless, it weighed that impermanence with the benefits of the current situation. Maine does not have an "open adoption" option, *see In re Melanie S.,* 1998 ME 132, 712 A.2d 1036,[16] and thus the court did not have the ability to terminate parental rights and at the same time require the adoptive parents to allow the children to retain their visits and communication with their mother. The court recognized that adoption is more permanent than foster care, but in weighing the permanency that could come with termination of parental rights and adoption by the foster family with the benefits of maintaining the children's relationship with the mother, it found that the latter was more beneficial to the children. The court also realistically acknowledged that a permanency plan for adoption may be an illusion in some cases.

[¶ 48] Although the evidence in this case would allow a court to come to the opposite result and conclude that termination is in the children's best interest, the evidence also allows for the result reached by the trial court. I cannot say that either result, given the record in this case, lay outside the court's discretion. We should not substitute our views of the record for the court's decision. Decisions as to the best interest of a child are among the most difficult that any court is called upon to make, whether in the context of private custody disputes or child protection actions. Our standard of review and the deference we give to such decisions is an acknowledgement of the difficult task, and the range of discretion reflects the difficulty. In this case the court properly took into consideration the goal of permanency, and it did not go outside of the bounds of its discretion in reaching its conclusion that termination of the parents' rights was not in the best interest of the children. For these reasons, I would affirm the judgment.

---

16. Some jurisdictions have statutes addressing contact or communication by adoptive parents or the child with the birth parents. *See Birth Mother v. Adoptive Parents,* 118 Nev. 972, 59 P.3d 1233, 1235 n. 3 (2002) (citing several state statutes).