MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2015 ME 139
Docket:        Pen-15-75
Submitted
 On Briefs:    July 23, 2015
Decided:       October 29, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and HUMPHREY, JJ.

## IN RE B.P.

SAUFLEY, C.J.

[¶1]   The parents of B.P. appeal from a judgment entered by the District Court (Newport, *Fowle, J.*) terminating their parental rights to B.P., their son, pursuant to 22 M.R.S. § 4055(1)(A)(1)(a) and (B)(2) (2014).   The parents primarily challenge the sufficiency of the evidence supporting the District Court's finding that they are not fit to parent B.P.  We affirm the judgment.

## I.  BACKGROUND

[¶2]   This case began when the state police responded to a physical altercation between the mother and the father that occurred in B.P.'s presence on July 3, 2012, when B.P. was just over a year old.  During the assault, the mother hit the father, knocking one of his teeth out.  Subsequently, B.P. was removed from the family home with custody granted to the Department of Health and Human Services through a preliminary protection order.  On November 5, 2012, the District Court entered a jeopardy order, finding that both the mother and father had abused substances and exposed the child to domestic violence.  The Department

placed B.P. in foster care with his maternal great aunt and uncle pending reunification with the parents.

[¶3]  In July 2013, the Department of Health and Human Services filed a petition to terminate the parents' parental rights.  After several continuances, the termination hearing began in April 2014.  Because the father was demonstrating an improved capacity to safely parent B.P., the court recessed the hearing and entered a judicial review order establishing a new reunification plan as to the father.  The plan contained a timeline toward trial placement of B.P. in the father's home with an ultimate goal of reunification with the father.  By agreement of the parties, the judicial review order that created the reunification plan contained several conditions, including (1) a strict prohibition of contact, direct or indirect, between the father and the mother, and (2) an order that the father continue counseling.  The agreed-to order containing the reunification plan for the father also included a cease reunification order with respect to the mother.

[¶4]  In a judicial review order dated October 8, 2014, the court noted that B.P.'s trial placement with his father had begun two days earlier.  The order also included the court's finding that the father "has continued to participate in services," and that supervised visits would continue for the mother.  Less than seven weeks later, on November 24, 2014, the Department removed B.P. from the trial placement with his father and returned him to the care of the foster parents.

The termination of parental rights hearing was resumed. In late December 2014 and January 2015, the trial on the petition for termination of parental rights was completed. The court entered a judgment terminating each parent's parental rights on February 5, 2015. The court found the following facts by clear and convincing evidence, and its findings are supported by competent evidence in the record. *See In re K.M.*, 2015 ME 79, ¶ 9, 118 A.3d 812.

[¶5] The mother has been convicted of drug trafficking, domestic violence assault, and theft. She has not been in drug treatment since April 2013 and failed to complete anger management counseling. Her challenges limit her ability to take care of herself, let alone her child.

[¶6] The father, unbeknownst to the Department at the time, had unilaterally withdrawn from counseling in August 2014, four months after the termination hearing had been recessed to allow for additional reunification efforts, and had been having contact with the mother. It was only because the court, the Department, and the GAL were operating on the assumption that the father was complying with the conditions of the reunification plan[1] that the trial placement with B.P. had commenced in October 2014.

---

[1] It is not clear from the record why the Department, which was paying the father's service providers, was unaware that the father had stopped attending his counseling sessions in August 2014.

4

[¶7]  Nine days before the end of the trial placement—and the planned full reunification of B.P. with the father—a sheriff's deputy responded to an altercation between the father and the mother's stepbrother at a gas station.  The confrontation began when the stepbrother saw the mother with the father and B.P., and took a picture to document it.  When the stepbrother left the station in his truck, the father pulled his vehicle in front of him, stopped, got out of the vehicle, confronted the stepbrother, and angrily accused the stepbrother of following him.  The father later reported to the police that the stepbrother had deliberately rear-ended his vehicle and threatened him with a gun.  No damage to the father's vehicle was observed, no gun was discovered, and the police were unable to substantiate any of the father's claims.

[¶8]  When the termination hearing recommenced in late December 2014, the father's counselor testified that although the father had been making progress, the father stopped attending the sessions in August 2014 because he felt that he did not need the counseling and that he was too busy.  The counselor also testified that the father continues to have difficulty controlling his verbalizations and that he is often overwhelmed by emotions.  The counselor opined that although the father is an adequate parent most of the time, he is not able to foresee dangerous situations and has inconsistent coping skills that create an unsafe environment for B.P.

[¶9]  At the hearing, the father was evasive about his relationship with the mother.  He said that he did not know what type of relationship he would have with her.  Although he insisted that he had not had much contact with the mother, he did not think that she was using drugs and he was convinced that he would be able to tell if she was.  The father also testified that he did not have any concerns with the mother having unsupervised contact with B.P.  In addition, the father acknowledged that domestic violence in a previous relationship had led to the removal of his other children from the home for a period of sixteen months.

[¶10]  The court found, and the record confirms, that the mother and father had been violating the no-contact order on a regular basis.  B.P. told his great aunt and uncle that he saw his parents together more than once after the April 2014 agreement, and the mother once told B.P. that his father would bring B.P. to see her soon.  Although B.P. reported seeing them together, the parents claimed that B.P. was fantasizing.  Caseworkers also reported seeing the parents together on more than one occasion immediately before and after attending supervised visits. The evidence strongly supports the court's findings that the father is not credible or honest, and cannot be relied upon to honor his agreements with the Department or to abide by court orders.

[¶11]  The father's unwillingness to protect B.P. from the mother's violence was an important factor in the trial court's decision, but so, too, was the father's

6

inability to control his own behavior. The court found that, throughout the pendency of this matter, the father has referred to the Department caseworker as a "whore," "streetwalker," "bitch," and "downtown girl." Many of these derogatory comments were made in a loud, hostile, and confrontational tone in the presence of his impressionable toddler. Most telling of his inability to control himself, after the stepbrother testified in court, the father confronted him in the parking lot and yelled: "Thanks, I will be paying you back while I am raping your daughter."

[¶12] As this evidence demonstrates and the court found, the father is highly volatile and unstable, and has ongoing difficulty regulating his emotional behavior. Given his own challenges, any contact between the mother and the father is likely to create more situations of domestic violence with resulting adverse impacts on B.P. Despite the history of domestic violence between them, the mother's persistent and completely untreated drug abuse, and their failure to complete or even acknowledge the need for any continued counseling, the mother and father intend to get back together, see no reason why they should not be together, and believe that the mother is capable of caring for B.P. in an unsupervised setting.

[¶13] Most importantly, the court found that the parents' behavior has had a negative effect on B.P., and the record supports this finding. That record reveals that B.P. has been unusually destructive with property, unusually aggressive with other children and household pets, and has shown a troubling proclivity for

self-harm. Evidence of the effect that the parents' behavior has had on B.P. also includes episodes in which B.P. said to his great aunt, "you don't love me anymore . . . you're going to throw me in the trash," and told his great uncle that B.P.'s father was "going to choke [the great aunt]" and that "daddy said he's going to kill" B.P.'s grandfather. Perhaps most alarming, B.P. attempted to choke their cat after returning from the trial placement with his father.

[¶14] The court found that B.P.'s great aunt and uncle have provided B.P. a warm, loving, and supportive home. They are willing to adopt B.P.

[¶15] The court found by clear and convincing evidence three grounds of unfitness as to the mother: (1) that she is unwilling or unable to protect B.P. from jeopardy and that these circumstances are unlikely to change within a time period that is reasonably calculated to meet B.P.'s needs, (2) that she is unable or unwilling to take responsibility for B.P. within a time that is reasonably calculated to meet B.P.'s needs, and (3) that she has failed to make a good faith effort to rehabilitate and reunify with B.P. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii), (iv). As to the father, the court found by clear and convincing evidence that he is unwilling and unable to protect B.P. from jeopardy and that these circumstances are unlikely to change within a time that is reasonably calculated to meet B.P.'s needs. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i). The court also found that termination

is in B.P.'s best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a). Both parents timely appealed. *See* 22 M.R.S. § 4006 (2014); M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶16] The parents argue that the court's decision to terminate their parental rights was not supported by clear and convincing evidence because of evidence that they have been making progress. "Evidence is sufficient to affirm an order terminating parental rights when a review of the entire record demonstrates that the trial court rationally could have found clear and convincing evidence in that record to support the necessary factual findings as to the bases for termination." *In re Marcus S.*, 2007 ME 24, ¶ 6, 916 A.2d 225 (quotation marks omitted). Evidence is clear and convincing when the court "could reasonably have been persuaded that the required factual findings were proved to be highly probable." *In re Thomas D.*, 2004 ME 104, ¶ 21, 854 A.2d 195 (quotation marks omitted).

[¶17] There was more than sufficient evidence in the record to support the findings that the mother is unable to take care of herself, let alone her son. She has continued to abuse drugs, she had contact with the father when she knew that doing so would put their child's return home to his father at risk, and she is violent with the people she professes to love. From this evidence, the court could reasonably have been persuaded to a clear and convincing level that at least one ground of parental unfitness existed as to the mother. *See In re D.C.*, 2015 ME 24, ¶¶ 3, 5,

112 A.3d 938 (per curiam) (affirming a finding of parental unfitness based upon competent evidence that the parent had not fully engaged in treatment programs and had tested positive for multiple illegal substances).

[¶18]  There was also more than sufficient evidence in the record to support the finding that the father has problems with anger, volatility, and emotional control; that these issues cause the father to behave inappropriately around B.P.; and that his behavior has been having a significant and strongly negative impact on B.P.'s behavior.  Substantial evidence in the record supports the court's finding that the father ignored the court's order—and the advice of the Department and his counselor—directing him not to have contact with the mother.  He instead allowed the mother to have unsupervised contact with B.P.  The evidentiary record also provided sufficient evidence that the father has little respect for the court or the Department, and was only complying with their orders when he saw it as convenient to do so.  On this record, the court did not err in finding, by clear and convincing evidence, that the father is unable to protect B.P. from jeopardy and that these circumstances are unlikely to change within a time that will meet B.P.'s needs.  *See In re Thomas H.*, 2005 ME 123, ¶¶ 9, 20-21, 889 A.2d 297 (affirming a court's finding of unfitness as to a parent who was unable to identify the risk of harm posed to her children by certain individuals).

10

[¶19]  Finally, we note the significant efforts undertaken to reunify B.P. with the father, including a trial placement after the termination petition was initially filed.  Yet, despite receiving numerous opportunities, the father appears to have sabotaged his chances to be reunified with his child.  When the Legislature enacted the Child and Family Services and Child Protection Act, it established permanency as the central tenet of the act.  *Id.* ¶ 23.  Therefore, with only limited exceptions, the Department is required to petition for termination of parental rights when a child has been in foster care for fifteen of the most recent twenty-two months.  22 M.R.S. § 4052(2-A)(A) (2014); *see also In re Jamara R.*, 2005 ME 45, ¶ 22, 870 A.2d 112 ("[O]nce a child has been placed in foster care, a statutory clock begins ticking.  In setting that clock, the Legislature has spoken in terms of days and months, rather than in years, as might better fit an adult's timeframe for permanent change."), *overruled in part on other grounds by In re B.C.*, 2012 ME 140, ¶ 14 n.2, 58 A.3d 1118.  This case has been ongoing for longer than three years.  The lack of permanence during the length of this case has already had too great an impact upon B.P., and the court did not err or abuse its discretion in determining that termination of both parents' parental rights is in B.P.'s best interest.  *See* 22 M.R.S. § 4055(1)(B)(2)(a); *In re Thomas H.*, 2005 ME 123, ¶¶ 16-17, 889 A.2d 297.  The clock has run out.[2]

---

[2]  Because we affirm the judgment as to both parents, we do not address the mother's additional

The entry is:

Judgment affirmed.

---

**On the briefs:**

Randy G. Day, Esq., Garland, for appellant father

Joseph P. Belisle, Esq., Bangor, for appellant mother

Janet T. Mills, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Newport District Court docket number PC-2012-18
FOR CLERK REFERENCE ONLY

---

argument that the judgment terminating her parental rights should be vacated if the court erred in terminating the father's parental rights. *See In re Scott S.*, 2001 ME 114, ¶ 35, 775 A.2d 1144 (vacating a judgment terminating a mother's parental rights because the finding as to the father was made in error).