MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 102
Docket:        Ken-19-65
Submitted
  On Briefs:   June 26, 2019
Decided:       July 2, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, HJELM, and HUMPHREY, JJ.

IN RE CHILD OF SCOTT L.


PER CURIAM

[¶1]  Scott L. appeals from a judgment of the District Court (Waterville, *Montgomery, J.*) terminating his parental rights to his child pursuant to 22 M.R.S. § 4055(1)(B)(2)(a), (b)(ii) (2018).[1]  He challenges the court's determination that termination of his parental rights is in the child's best interest.  *See id.* § 4055(1)(B)(2)(a).  We affirm the judgment.

## I.  BACKGROUND

[¶2]  The following facts are drawn from the court's findings, which are supported by competent record evidence, and from the procedural record.  *See In re Children of Corey W.*, 2019 ME 4, ¶ 2, 199 A.3d 683.

[¶3]  In March of 2017, the Department of Health and Human Services filed a petition for a child protection order and preliminary protection order,

---

[1]  The child's mother consented to termination of her parental rights to the child at issue here and is not a party to this appeal.  The father also has a younger child who is not in his custody and is not subject to this action.

requesting that the court place the child—who was three years old at the time—in the temporary custody of the Department. *See* 22 M.R.S. §§ 4032, 4034(1) (2018). The petition alleged that the child was in jeopardy due, in part, to the father's lengthy criminal history as well as his current unavailability to parent the child because he was incarcerated. The court (*Stanfill, J.*) issued a preliminary protection order and ordered that the child be placed in departmental custody.

[¶4] In April of 2017, the court entered an agreed-upon jeopardy order as to the father based on the father's ongoing incarceration, his never having been the child's primary caregiver, and the issuance of an order for protection from abuse against the father in an action filed by the mother after he threatened to kidnap the child. *See* 22 M.R.S. § 4035 (2018).

[¶5] The Department arranged a trial placement of the child in the father's home from February to May of 2018, but that placement ended unsuccessfully for the reasons described below, and the child was returned to foster care, where she has since remained.

[¶6] During the summer of 2018, the Department petitioned to terminate the father's parental rights. *See* 22 M.R.S. § 4052 (2018). The following November, the court (*Montgomery, J.*) held a hearing on the petition. The

witnesses included several of the child's therapists and support workers, departmental caseworkers, the child's foster mother, the father and his therapist, and the guardian ad litem. The court subsequently entered a judgment terminating the father's parental rights supported by its determination, based on clear and convincing evidence, that the father had been unwilling or unable to take responsibility for the child and would be unlikely to do so within a time reasonably calculated to meet the child's needs. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(ii). The court also determined that termination of the father's parental rights is in the child's best interest. *See id.* § 4055(1)(B)(2)(a).

[¶7] The court made the following factual findings, all of which are supported by competent record evidence. *See In re Child of Jonathan D.*, 2019 ME 14, ¶ 5, 200 A.3d 799.

> At the time of the jeopardy hearing, [the father] was incarcerated for Aggravated Furnishing of Scheduled Drugs. He was sentenced to two years, all but six months suspended. [The father] has an extensive criminal history, which includes multiple theft and burglary convictions as well as violations of conditions of release.
>
> In 2015, [the mother] obtained a protection from abuse order against [the father] . . . on the basis of her allegations that 1) [the father] strangled her when she was pregnant with [the child]; 2) he engaged in abusive, controlling, and coercive behavior during their relationship; and 3) he threatened to go to [the

mother]'s home and kidnap [the child]. [The father] disputes these allegations.

. . . .

. . . [The father] had begun visiting with [the child] in his home in November 2017. He then began bracketed visits until February 2018 when the Department began a trial placement with [the father]. He remained in consistent contact with the Department and the former foster parents.

During the trial placement, [the father] struggled to get [the child] to her necessary services and appointments despite numerous conversations with the Department and changes to transportation arrangements. While [the father] managed to get [the child] to [the child development center] more consistently than to her other appointments, her attendance there still declined significantly. As for [the child]'s lack of attendance at other appointments, [the father] maintained that the Department had not set up transportation for them.

Between February and May 2018, [the child] was attending [occupational therapy], but [the father] attended with her only once. As [the child]'s attendance at [the child development center] declined, so did her attendance at her OT sessions. From February to May, [the child] attended nine OT sessions but missed 15. The irregular nature of her attendance made it difficult for [the child] to make and sustain improvement, especially with regard to her peer interaction and emotional regulation.

During the trial placement, [the father] struggled to find appropriate caregivers for [the child] when he was working. On April 22, 2018, he engaged a friend who was well-known to the Department (and had not been approved as a caregiver for [the child]) to care for [the child]. While he was gone to work, this friend allowed [the mother] into his home to visit with [the child]. After [the father] got home from work, [the child] was awake. She stayed awake until approximately 2:00 a.m.

The next day, April 23, 2018, [the father] slept in until 9:30 a.m., leaving [the child] unsupervised. He did not set an alarm when he went to bed the night before because [the child] had stayed up so late that he assumed she would sleep late as well. When [the father] awoke that morning, he could not find [the child] anywhere in the house. He called the police for help. [The child] was eventually found on the roof of the apartment building. . . . When [Department] agents toured [the father]'s home, they were concerned about the home as it was described as filthy and smelling like smoke and bleach. There was a marijuana plant on the floor in [the father]'s bedroom.

Thereafter, [the child]'s internal sense of well-being showed signs of stress. . . . She also began to have nightmares, and her behavior declined.

. . . .

Up until May 2018, the evidence suggests that [the father] consistently attended counseling sessions. However, he stopped going at all after May 9, 2018. He had not fully reached his treatment goals when he stopped attending, and then was discharged in July due to lack of attendance. He likewise withdrew from communicating with the GAL in May 2018 and did not reach out at all thereafter. He also stopped participating in random drug screens once the trial placement began.

The father filed a timely appeal from the judgment. *See* 22 M.R.S. § 4006 (2018); M.R. App. 2B(c)(1).

## II. DISCUSSION

[¶8] The father does not challenge the court's factual findings or its determination of parental unfitness, *see* 22 M.R.S. § 4055(1)(B)(2)(b)(ii), but

asserts only that the court erred by concluding that termination of his parental rights is in the child's best interest, *see id.* § 4055(1)(B)(2)(a).[2] "We review the court's factual findings related to the child's best interest for clear error, and its ultimate conclusion regarding the child's best interest for an abuse of discretion, viewing the facts, and the weight to be given them, through the trial court's lens." *In re Children of Christopher S.*, 2019 ME 31, ¶ 7, 203 A.3d 808 (quotation marks omitted).

[¶9] Here, the court based its best interest determination primarily on the child's need for permanency. In determining whether termination of parental rights is in the child's best interest, the court is required to consider "the needs of the child, including the child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs." 22 M.R.S. §§ 4055(1)(B)(2)(a), (2) (2018); *see also In re Child of Mercedes D.*, 2018 ME 149, ¶ 21, 196 A.3d 888. Also relevant to the court's determination is the harm the child may suffer if the parent's rights are not terminated and the child's need for permanence and

---

[2] To the extent that the father may be seen to assert that the court erred by concluding that he is parentally unfit, that contention is not persuasive. *See In re Children of Anthony M.*, 2018 ME 146, ¶ 8, 195 A.3d 1229 (stating the standard of review of a court's determination of parental unfitness).

stability. *See Adoption of Isabelle T.*, 2017 ME 220, ¶ 49, 175 A.3d 639. "[P]ermanency is the 'central tenet' of the Child and Family Services and Protection Act," 22 M.R.S. §§ 4001 to 4099-H (2018). *In re Children of Jessica D.*, 2019 ME 70, ¶ 8, --- A.3d ---. "Permanency is a dynamic concept that must be fashioned from the actual circumstances and needs of the child or children before the court." *In re Child of Carl D.*, 2019 ME 67, ¶ 9, --- A.3d --- (quotation marks omitted).

[¶10]  Contrary to the father's assertions on appeal that the child already had permanency and that her best interest was met through the trial placement with him, the father testified that he would be fully ready to take custody and care for the child if given another six months.  As the GAL responded at the hearing, six months is too long for the child to wait.  *See In re Child of Peter T.*, 2019 ME 56, ¶¶ 6, 13, 207 A.3d 183.  The child's behavioral and medical needs are significant.  When, during the trial placement, he had the opportunity and corresponding responsibility as the child's primary caregiver to provide her with a safe and nurturing home, the father came up materially short of meeting her needs, and as a result the Department properly suspended the trial placement.  As the court also found, he has not fulfilled his obligation to

effectively address his parenting deficiencies, which would be necessary for him to be able to parent the child effectively.

[¶11]  There is sufficient evidence in the record for the court to have found that "the time is now for [the child] to settle into a life of safety, stability, routine, and love" and that "permanence must not be delayed," but that the father will not able to provide her with that permanence in a timely way.  *See In re Jamara R.*, 2005 ME 45, ¶ 22, 870 A.2d 112 ("[O]nce a child has been placed in foster care, a statutory clock begins ticking.  In setting that clock, the Legislature has spoken in terms of days and months, rather than in years, as might better fit an adult's timeframe for permanent change."), *overruled in part on other grounds by In re B.C.*, 2012 ME 140, ¶ 14 n.2, 58 A.3d 1118.  The court did not err or abuse its discretion by concluding that terminating the father's parental rights is in the child's best interest so that she can have the permanence she needs.  *See* 22 M.R.S. § 4055(1)(B)(2)(a); *In re Thomas H.*, 2005 ME 123, ¶¶ 16-17, 889 A.2d 297.

The entry is:

        Judgment affirmed.

Kevin P. Sullivan, Esq., Sullivan Law, P.C., Gardiner, for appellant father

Aaron M. Frey, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Waterville District Court docket number PC-2017-12
FOR CLERK REFERENCE ONLY