MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2020 ME 3
Docket:         Ken-19-296
Submitted
  On Briefs:    December 17, 2019
Decided:        January 7, 2020

Panel:          SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HUMPHREY, JJ.

## IN RE CHILD OF COREY B.

PER CURIAM

[¶1]    Corey B. appeals from a judgment of the District Court (Waterville, *Montgomery, J.*) terminating his parental rights to his child.  The father challenges the court's findings that he was unable to take responsibility for the child within a time reasonably calculated to meet the child's needs, *see* 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii) (2018), and that termination of his parental rights is in the child's best interest, *see id.* § 4055(1)(B)(2)(a) (2018). In addition, he alleges that the court violated his constitutional rights. We affirm the judgment.

## I.  BACKGROUND

[¶2]  On July 6, 2017, when the child was two years old, the Department of Health and Human Services filed a petition for a child protection order.  *See id.* § 4032 (2018).  The mother agreed to a finding of jeopardy (*Stanfill, J.*) on October 25, 2017, and the father agreed to a finding of jeopardy on

2

January 30, 2018. *See id.* § 4035 (2018). On November 8, 2018, the Department filed a petition to terminate the mother's[1] and father's parental rights. *See id.* § 4052 (2018). After a two-day hearing on March 29, 2019, and May 9, 2019, *see id.* § 4054 (2018), the court (*Montgomery, J.*) entered a judgment terminating the father's parental rights to the child.

[¶3] The court made the following findings of fact, which are supported by competent record evidence. *See In re Child of Kimberly K.*, 2019 ME 145, ¶ 4, 217 A.3d 63.

> [The child] was born drug-affected . . . . At that time, [the father] was incarcerated. He was released from prison on March 8, 2017[,] with three years' probation. Shortly thereafter, [the mother] was arrested for Domestic Violence Assault, and she faced a full probation revocation. [She] placed [the child] with her mother . . . . At some point thereafter, [the child] began staying with [the father] at [the father's] mother's home.
>
> . . . .
>
> By mid-June 2017, [the mother and father] indicated their intent to reconcile and live together in an apartment [the mother] had secured. DHHS asked the couple to participate in random drug screening, but both parents failed to go. On June 29, 2017, [the mother] overdosed on heroin. [The child] was with her at that time. In fact, [the father] was also initially present at [the mother's] residence, but he left her residence because [she] was using. Despite knowing that she was using drugs, [the father] left [the child] there with [the mother]. . . .

---

[1] The child's mother consented to an order terminating her parental rights to the child on March 29, 2019, and she is not a party to this appeal.

. . . [The father] was taken by police to the hospital in early September 2017 for a possible overdose. [The father] admitted to using heroin at that time. In early November, [the father's probation officer] reported that [the father] was living with several other people in an apartment where there were mattresses lined up on the floor. The Department was unable to make any contact with [the father] throughout November and December 2017. In mid-December 2017, [the father's] requested paternity test result showed him to be [the child's] father.

[The child] entered foster care [in October 2017]. He was placed with . . . his maternal grandmother. By April 3, 2018, DHHS reported that [the child] had achieved stability and had begun to show more age-appropriate behaviors. He was enrolled in child care where he received socialization, structure and exercise.

On January 30, 2018, [the child's father] agreed to Jeopardy, and he began to make efforts toward reunification with [the child]. As part of the reunification plan, he agreed to participate in services to address his mental health issues and significant substance abuse. [The father] also completed drug screens through probation, consistently testing positive for marijuana use (for which he had a card) and for Suboxone, for which he did not have a prescription. He did not, however, participate in the recommended random drug screens through DHHS.

[The father] agreed to participate in the MEPP [Maine Enhanced Parenting Project] program, but his consistent marijuana use was a potential obstacle in the MEPP abstinence program. . . .

Despite the marijuana use and [a] transportation problem, [the father] did well in MEPP. He was reportedly forthright, open to suggestions and fully participating in groups. He was set to graduate in July 2018. He was employed full time and doing well at his job. He moved into Serenity House, so his living situation was more stable (although not appropriate for [the child]). He was working toward obtaining permanent housing. He was attending

weekly visits with [the child], for which he was appropriately prepared . . . . The visits were going very well. . . .

[The father] completed the MEPP IOP [Intensive Outpatient Program] and parenting sessions in July 2018. He remained sober while in the program—with the exception of marijuana use—and worked to decrease that as well. At the same time, he was doing very well with his probation conditions. Although recommended, however, [the father] did not engage in follow-up counseling at Crossroads when he graduated from MEPP. He did begin seeing [a physician who specializes in addiction] for Suboxone treatment.

Beginning in mid-August, [the father's] visits with [the child] were increased from two hours to four hours and thirty minutes. The longer visits seemed to go very well.

During the month of September 2018, although he had visited with [the child] consistently up to that point, [the father] began missing visits. . . .

In mid-October, [the father] was involuntarily discharged from his Suboxone treatment . . . . One of [the father's] drug tests was positive for alcohol and Opana (oxymorphone, an opiate). While [the father] readily admitted to using alcohol, he vehemently denied using opiates. Believing the positive test results were legitimate and not the result of lab error, [his physician] discharged [the father] from the Suboxone treatment. Likewise, as a consequence of having missed . . . three visits in September, [the father's] visitation was suspended in November 2018.

[The child] continued to make positive strides in his placement. He had difficulty, however, with regulating his own emotions and behaviors. He was referred to child development and counseling services.

At the January 22, 2019[,] [Facilitated Family Team Meeting], [the father] reported that he had started counseling at Crossroads. He had lost his job but was looking for a new one. He was not back

in Suboxone treatment but reported that he was doing well without it. He continued to comply with the conditions of his probation with the exception of losing his job and failure to find stable housing.

In essence, DHHS seeks to terminate [the father's] parental rights to [the child] for several reasons related to his own consistency and stability. First, the Department contends that [the father] missed enough visits with [the child] in September 2018 to result in suspension of visitation. In fact, even once visits were reinstated in January 2019, he missed two more. By the time of hearing, [the father] had not seen [the child] since February 8, 2019.

Additionally, since July 2017, [the father] had several housing arrangements—some with family, some with friends—none of which would accommodate [the child]. Moreover, he contended at hearing that his grandmother had room for both he and [the child] and that he was moving there. Although his grandmother confirmed that he could stay at her home with [the child], [the father] had not taken the steps necessary to finalize that move. In fact, the record evidence showed that [the father] knew from the time of his release from prison that stable housing was a significant factor in reunification. A year and nine months after [the child] entered foster care, however, [the father] is still without a track record of living in a stable home environment for more than a few months.

Finally, [the father's] employment situation has also been inconsistent. While [the father] has been fairly dedicated to looking for and obtaining employment, he has not consistently maintained employment for more than a few months at a time since he was released from prison.

While the court acknowledges and commends [the father] on his extended sobriety as to opiates, along with the progress he has made to be "comfortable in [his] own skin," [the father] has not yet

achieved the kind of stability and consistency in his own life to nurture and care for [the child].

. . . .

. . . In short, the court finds by clear and convincing evidence that the first two statutory definitions of parental unfitness are established with respect to [the father].

. . . .

[The child] continues to reside with his maternal grandmother, her partner, and . . . his 13-year-old half-brother. Although the home is small and the boys must share a room, [the child] has clearly benefitted from the routine and stability established there. He is a happy and active four-year-old boy who continues to show very good development. He speaks much more clearly and has increased his vocabulary. He responds well to redirection but still struggles some with aggressive behavior toward other children. The court does not doubt that a safe, loving, and stable home is in [the child's] best interest.

## II. DISCUSSION

A.    The Father's Unfitness

[¶4] The father argues that at the time of the termination hearing, he was willing and able to alleviate jeopardy and take responsibility for the child. We set aside a trial court's finding of unfitness based upon clear and convincing evidence "only if there is no competent evidence in the record to support it, if the fact-finder clearly misapprehends the meaning of the evidence, or if the finding is so contrary to the credible evidence that it does not represent the

truth and right of the case." *In re Cameron B.*, 2017 ME 18, ¶ 10, 154 A.3d 1199 (quotation marks omitted). Evidence is clear and convincing when "the trial court could have reasonably been persuaded on the basis of evidence in the record that the required factual findings were highly probable." *In re Charles G.*, 2001 ME 3, ¶ 5, 763 A.2d 1163 (quotation marks omitted).

[¶5] Here, the court concluded based upon clear and convincing evidence that, despite his progress, the father "has not yet achieved the kind of stability and consistency" necessary to care for the child. Given the court's supported factual findings, that conclusion is not clearly erroneous. *See In re Cameron B.*, 2017 ME 18, ¶ 10, 154 A.3d 1199.

[¶6] The father next contends that the court erred in finding that he tested positive for oxymorphone while he was a patient of the physician treating him for addiction. The finding was based on the physician's testimony. Ordinarily, "[w]e review a trial court's decision to admit evidence for abuse of discretion or clear error." *In re Arturo G.*, 2017 ME 228, ¶ 19, 175 A.3d 91. However, where a challenge was not preserved for appellate review, we apply the obvious error standard. *See* M.R. Evid. 103(d); *State v. Haji-Hassan*, 2018 ME 42, ¶ 13, 182 A.3d 145.

[¶7]  The father objected to the physician's testimony at the hearing on reliability and hearsay grounds.  However, the fact that the physician had stated that the father tested positive for the opiate was already admitted in evidence in the agreed-to findings of the court's (*Stanfill, J.*) November 28, 2018, judicial review and permanency planning order, and the father did not object to the order's admission at hearing.  *See* M.R. Evid. 703; *see also State v. Archer*, 2011 ME 80, ¶ 20, 25 A.3d 103 (concluding that the trial court was correct to allow the State's medical expert to testify about a medical record that was already in evidence); *In re Scott S.*, 2001 ME 114, ¶ 12, 775 A.2d 1144 ("When a different trial judge presides at a later stage of the process, that trial judge . . . may consider and rely on the findings of fact and conclusions of law contained in the orders or judgments entered by the prior judge.").

[¶8]  The court (*Montgomery, J.*) here did not commit obvious error when it considered the finding regarding the positive drug test in the November 2018 order.  Furthermore, the father has failed to demonstrate that he was prejudiced by the admission of the physician's testimony concerning the drug test.  *See In re Joshua B.*, 2001 ME 115, ¶ 10, 776 A.2d 1240 (explaining the obvious error standard and noting that a "party claiming error must demonstrate prejudice from the error").  The court's findings rest on a number

of grounds apart from the father's drug test result. The court did not err in finding the father unfit.

B.   Best Interest of the Child

[¶9]   Contrary to the father's contention, the court did not abuse its discretion in determining that termination of the father's rights was in the child's best interest. *See* 22 M.R.S. § 4055(1)(B)(2)(a). "We review the court's factual findings related to the child's best interest for clear error, but its ultimate conclusion regarding the child's best interest for abuse of discretion." *In re Thomas H.*, 2005 ME 123, ¶ 16, 889 A.2d 297. Specifically, the father's argument centers around an assertion that the child's current placement with his maternal grandmother fails to achieve permanency.

[¶10]   The question of who should adopt a child is beyond the scope of a termination proceeding. *See In re Children of Nicole M.*, 2018 ME 75, ¶ 17, 187 A.3d 1. However, the court may evaluate a child's current placement as part of its best interest determination. 22 M.R.S. § 4055(2) (2018); *see In re Kenneth S.*, 2017 ME 45, ¶ 6, 157 A.3d 244 ("[I]n conducting a best interest analysis, the court may consider evidence that the current foster placement is furthering the child's permanency plan, especially where that plan is to place the child for adoption."); *In re Annie A.*, 2001 ME 105, ¶ 28, 774 A.2d 378. Here,

substantial evidence in the record supported the court's finding that the child's current placement with his maternal grandmother benefits the child. Combined with the court's other best interest findings regarding the child's developmental progress, the court did not err in determining that termination of the father's rights was in the child's best interest.

C.      Due Process

[¶11]   The father argues that his constitutional rights were violated because the court placed greater weight on the child's need for permanency than on the father's fundamental due process right to parent his child. *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). His argument centers on the trial court's language measuring the length of time the father needs in order to be able to protect the child from jeopardy against the time within which the child should achieve permanency:

> As in most protective child custody cases, when this case began, two timeclocks began to run. One measured the time [the father] needed to stabilize himself, especially in the areas of housing, employment, and sobriety maintenance. The other measured the maximum time period necessary for [the child] to achieve permanency. Unfortunately, these two timeclocks do not measure the same length of time.
>
> On the one hand, the kind of stability [the father] is struggling to achieve in his own life takes time, and [he] may, in fact, be on the path to success in this regard. Even so, however, each of these goals—housing, employment, and sobriety—are reached through

a *process* that requires time, trial and error, developed insights, and consistency. Despite the age of this case, [the father] has not met any of these goals for any significant duration.

On the other hand, the maximum time period necessary for [the child] to achieve permanency has turned out to be a shorter period than the time [the father] needs to achieve stability. The time for [the child] to achieve permanency is now; the time [the father] needs to achieve stability still requires months. . . .

[¶12] Because the father raises this constitutional argument for the first time on appeal, we apply the obvious error standard of review. *See In re Child of Lacy H.*, 2019 ME 110, ¶ 9, 212 A.3d 320. The Legislature measures a parent's ability to "protect the child from jeopardy" or "take responsibility for the child," in terms of a "time which is reasonably calculated to meet the child's needs." 22 M.R.S. § 4055(1)(B)(2)(b)(i), (ii). As we have frequently noted, the trial court must assess the time frame within which the parent can protect the child from the perspective of the child rather than the parent. *See In re Child of Dawn B.*, 2019 ME 93, ¶ 16, 210 A.3d 169.

[¶13] "Through many years of interpretation, we have concluded that the procedures, burdens, and standards set out in section 4055 constitute the means by which the fundamental constitutional right to parent is safeguarded." *Adoption of Tobias D.*, 2012 ME 45, ¶ 17, 40 A.3d 990. We have recognized that "[w]hen the Legislature enacted the Child and Family Services and Child

Protection Act, it established permanency as the central tenet of the act." *In re B.P.*, 2015 ME 139, ¶ 19, 126 A.3d 713; *see In re Jamara R.*, 2005 ME 45, ¶ 22, 870 A.2d 112 ("[O]nce a child has been placed in foster care, a statutory clock begins ticking.  In setting that clock, the Legislature has spoken in terms of days and months, rather than in years, as might better fit an adult's timeframe for permanent change."), *overruled in part on other grounds by In re B.C.*, 2012 ME 140, ¶ 14 n.2, 58 A.3d 1118.  Because Maine's clear and convincing evidence standard is constitutional, and the court here correctly applied that standard, we affirm the court's judgment.  *See In re Child of Shayla S.*, 2019 ME 68, ¶ 9, 207 A.3d 1207; *In re Child of Scott L.*, 2019 ME 102, ¶ 11, 210 A.3d 845.

The entry is:

> Judgment affirmed.

---

Julian Richter, Esq., Richter Law, LLC, Gardiner, for appellant father

Aaron M. Frey, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services